## Case No. 12,621.

### SEDGWICK v. PLACE et al.

[12 Blatchf. 163;[1] 10 N. B. R. 28.]

Circuit Court, S. D. New York.   June 16, 1874.[2]

BANKRUPTCY—INDIVIDUAL PROPERTY — PARTNERSHIP—SETTLEMENT ON WIFE—FRAUD ON CREDITORS.

1. Certain property settled by a member of a copartnership firm on his wife, held to have been his individual property and not the property of the firm.

2. Such settlement held to have been made in fraud of creditors and to be void as against the assignee in bankruptcy of the settlor.

[Cited in Beecher v. Clark, Case No. 1,223; Re Duncan, Id. 4,131; Barnes v. Vetterlein, 16 Fed. 219.]

[Cited in Savage v. Murphy, 34 N. Y. 508.]

3. The settlement consisted in purchasing a lease of land in the city of New York, and erecting a house on the land, as a family residence, and furnishing the house with household furniture, the expenditures running through a period of over two years.

4. The pecuniary condition of the settlor, during the entire period of time, examined, and the acts of the settlor treated as one transaction.

5. In September, 1865, P., who was afterwards adjudged a bankrupt, purchased certain leasehold property on the Fifth avenue, in the city of New York, on account of which he paid the sum of $4,500. This property he caused to be transferred to his wife in December, 1865, as a voluntary settlement. He expended in the improvement of this property, and for the furniture of the house erected thereon, in the year 1865, the sum of $11,774; in 1866, the sum of $49,852; in 1867, prior to May 1st, $20,920; and between May 1st and November 25th, when the copartnership firm of which he was a member failed, $12,985. During the year 1865, the firm lost the sum of $175,000 in gold. During the same year it lost all its investments in another firm, and $200,000 by its endorsements therefor. It was losing money rapidly during the whole of the years 1866 and 1867, until it failed, in November, 1867: Held, that whether the conveyance was in fraud of creditors was a question of fact, to be decided upon all the evidence—whether, in buying the lot on the Fifth avenue, and making the payments and improvements, the bankrupt had good reason to believe, and did believe, that he could present such property to his wife, as a gift, and be able to pay his debts then contracted, and to be contracted in the business he contemplated pursuing, or whether the transaction was an anchor to windward, for the benefit of himself and family.

[Cited in Odell v. Flood, Case No. 10,428; Scott v. Mead, 37 Fed. 873.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversing Case No. 12,620.]

6. Each payment was a separate transaction, respecting which the same inquiry must be made.

7. The nature of the business was to be considered, as well as the necessary expenses of the style and society in which the parties lived; and that a family provision which would leave to the settlor an estate which would be respectable and comfortable in the country, and an ample protection against contingencies, might be entirely insufficient when subject to the expenses and luxuries of a city life.

8. Under the circumstances of this case, the gifts to the wife were adjudged to be in fraud of creditors and illegal and void.

[Cited in Platt v. Mead, 9 Fed. 98.]

9. A mortgage held valid, made by the wife on the lease and joined in by the husband, after the lease was conveyed to her, the consideration of the mortgage being a loan of money made to her in good faith by the mortgagee, who had no knowledge of the weakness of her title.

[Cited in Simms v. Morse, 2 Fed. 329.]

10. Part of the money received by the wife for the loan on the mortgage was paid by her to her husband, and, as a consideration, he conveyed to her certain lots of land. She afterwards sold those lots. It was held that she must account to the assignee in bankruptcy for what she received on the sale of the lots.

11. A mortgage held void, made by the wife on the lease, to creditors of the husband's firm, after it had failed, as security for an existing debt, they having knowledge of all the facts which made the wife's title invalid.

12. A settlement made by S., another member of the same firm, on his wife, at about the same time, of a house and lot, occupied by him as a family residence, and the furniture in the house, and certain government bonds, held to have been made in fraud of creditors, and to be void as against the assignee in bankruptcy of the settlor.

[Cited in Barnes v. Vetterlein, 16 Fed. 219.]

13. The pecuniary condition of the settlor at the time of making the settlement, and afterwards, examined.

14. The wife was quite ill when the settlement was made, and she immediately made her will, giving the benefit of the whole property to the husband during his life, and, after his death, to his children, who were not hers, and she died six months after the settlement was made, and seventeen months before the firm failed. The bonds were never delivered to the wife, but continued in the possession of the firm, and were used by it, and were first delivered by it to her executor after the firm failed.

15. The bonds having been sold, the executor was held liable only for their value when sold, and not for the highest market price they had reached.

[Appeal from the district court of the United States for the Southern district of New York.]

In equity. In this case, several appeals were taken from a decree of the district court, made in a suit in equity brought in that court by [John Sedgwick] the assignee in bankruptcy of James K. Place and James D. Sparkman, composing the firm of J. K. Place & Co., to set aside various transfers of property made by the bankrupts. The decision of the district court is reported in [Case No. 12,620].

[For prior proceedings, see Case No. 12,622, and note.]

Francis N. Bangs, for plaintiff.

Alexander H. Wallis and William F. Sheppard, for Barker.

Edward H. Owen, for Phipps & Co.

Jedediah K. Hayward, for executors of Susan A. Place.

Edgar S. Van Winkle, for executors of Mrs. Sparkman.

HUNT, Circuit Justice. The plaintiff, as the assignee in bankruptcy of J. K. Place & Co., files his bill to set aside as void various assignments made by the bankrupts. Many questions were presented to the district court for its decision, which are now brought before this court upon appeal. Although arising out of transactions with one or more of the firm of J. K. Place & Co., and although, in some particulars, dependent upon the same evidence, the questions are distinct, and must be stated and passed upon separately. I will give them, in order, such consideration as may seem necessary.

For many years prior to December 1st, 1865, a large mercantile business had been carried on, in the city of New York, by James K. Place and Ephraim B. Place, as general partners, and James D. Sparkman, as special partner, under the style of J. K. & E. B. Place. On that day the firm was dissolved and a new firm was formed, under the name of J. K. Place & Co., consisting of James K. Place and James D. Sparkman only, both being general partners. This firm continued in business until November 19th, 1867, when it failed.

The title to certain property on the Fifth avenue was acquired by James K. Place in September, 1865, by the delivery to him, on that date, of a permanent lease of the same. This lease was assigned by Mr. Place to A. H. Wallis, for the purpose of being transferred by him to Mrs. Place, the wife of the assignor, and the same was so transferred by Wallis. The transfer to Wallis, and that by him to Mrs. Place, bear date of December 1st, 1865. They were acknowledged April 18th, 1866, and recorded on that day; and it is insisted by the assignee in bankruptcy that, they were not, in fact, executed and delivered until some time in the month of April, 1866.

I. The first question argued is this—was the transfer of the Fifth avenue leasehold lots by James K. Place to Susan A. Place, his wife, made through the agency of Alexander H. Wallis, fraudulent and void?

While this property was held by Mrs. Susan A. Place, mortgages upon it were executed by her, one to Joseph S. Barker, to wit, in May, 1867, and one to Cross, now held by Phipps & Co., in January, 1868. The counsel for the assignee concedes, that, if the title of Mrs. Place is good, that of her mortgagees is good also, and hence, he says, her title is the first object of attack. If her title is invalid, it is insisted that the mortgages are also invalid.

The general propositions of the assignee as to the Fifth avenue property are these: (1.)

That it was partnership property, and has been wrongfully withheld from the payment of the partnership debts of J. K. & E. B. Place and of J. K. Place & Co.; (2.) That, if it was the separate property of James K. Place, it was conveyed by him to his wife in fraud of creditors and of his partner.

(1.) I am not able to concur with the assignee in his claim that the property in question was the property of the firm of J. K. & E. B. Place, or of the firm of J. K. Place & Co. The purchase was made by Mr. Place individually, for his own account, and not on account of either of the firms named. Neither of the partners was ever consulted about the purchase, so far as the evidence shows, nor did they ever claim any interest in the estate. The title was taken in the name of Mr. Place personally, and was by him personally transferred to Mr. Wallis. I see nothing in the book-keeping of the transaction which contradicts this conclusion. The accounts respecting the property were carried on the books of the firm for the convenience of Mr. Place, as were all his other private affairs, but the entries, taken together, show it to have been a private transaction. It was so deemed by the partners, as well as by the subordinates making the entries, from the beginning.

(2.) Was the conveyance by James K. Place to his wife, of the Fifth avenue property, fraudulent, within the purview of the bankrupt act [of 1867 (14 Stat. 517)]?

It is impossible, in rendering a decision upon a case containing so great a volume of testimony, received from so many witnesses, and based upon statements contradictory, involved, and confused, to make an argument upon the facts. That duty has been performed by the counsel for the respective parties, with great labor and great skill. I shall content myself generally with a statement of facts, as I find them to be, without attempting to sustain the conclusion of fact by argument or reference.

As already stated, the lease of the Fifth avenue property was assigned to Mr. Place in September, 1865. On the 19th of that month he paid to J. A. Livingston $4,500, on the purchase of the lease, having previously paid the sum of $500. Contracts were at once made for building a house on this property, and making other improvements, for which large amounts were paid by Mr. Place from time to time. The amounts thus paid for the improvement of the property, and for the furniture of the house, were made at the rate of from $7,000 to $8,000 a month, from September, 1865, to September, 1866. The books of J. K. & E. B. Place show that there was paid on this account as follows: Up to November 30th, 1865, $10,028.35; up to December 31st, 1865, $11,774.44; up to December 31st, 1866, $61,627.00; up to April 30th, 1867, $82,547.08; and up to November 25th, 1867, $95,533.04. Thus, there was paid during 1865, $11,774.44; during 1866, $49,852.56;

in 1867, prior to May 1st, $20,920.08; and between May 1st and November 25th, $12,985.96. It is stated, in the opinion of the court below, and quoted in Mr. Hayward's brief, that, "by the 1st of December, 1865, $25,000 had been expended on account of the property, although only $10,028.35 had been debited to the account."

The question is not, simply, what was the condition of Mr. Place in September, 1865, when he made the payments to Mr. Livingston for the lot, but what was his condition when he made the various payments, during the residue of the term, for the much larger expenditures for the building and furniture?

The law upon this question of fraud has been elaborately argued by the respective counsel, and numerous authorities are cited in the opinion of the court below. The principles to be applied here are not difficult to discover. There is no act or fact in the case, that I discover, which stamps the transaction as necessarily and absolutely fraudulent. Fraud or no fraud is generally a question of fact, to be determined by all the circumstances of the case. Under all the facts, as developed by the evidence on this trial, is there a reasonable presumption, that, in buying the lot on Fifth avenue, or in making the subsequent payments, Mr. Place intended to defraud his creditors, existing or future? Were his pecuniary affairs in such a state that he had good reason to believe, and did believe, that he could present, as a gift, to his wife, this amount of property, and still be able to pay the debts due and to become due in the business he was then engaged in and that which he contemplated pursuing? Had he good reason so to believe, and did he so believe, during the entire period of the time in which he was making the payments? On the other hand, was he weak and unsteady in his pecuniary affairs, and was this transaction an anchor to windward, by which advantage to himself and family might be secured, in case the storm was too heavy for him to bear? Was this his motive and intent when he made any of these payments? Savage v. Murphy, 34 N. Y. 508; Case v. Phelps, 39 N. Y. 164; Spirett v. Willows, 3 De Gex, J. & S. 293, and 11 Jur. (N. S.) pt. 1, p. 70; Freeman v. Pope, L. R. 9 Eq. 206; Carpenter v. Roe, 10 N. Y. 227; Babcock v. Eckler, 24 N. Y. 623.

The conveyance to Mrs. Place was a single transaction in form; but, in truth, every payment was a new and separate conveyance of property, to her and for her benefit. When Mr. Wallis assigned the lease to her, the property became hers, and expenditures upon it but gave greater value to her estate. This was known to Mr. Place, and, if any part of his proceedings falls within the censure of the law, we are justified in considering that as reflecting upon all that preceded it. If he was not honest in turning the property of his creditors into the lap of his wife in the summer of 1866, we shall be justified in characterizing in like manner what took place

in the autumn of 1865. The subsequent expenditures were, in themselves, distinct and separate acts, but in pursuance of a plan formed when the first step was taken. The whole is to be taken as one transaction, and to be judged of by what was contemplated at the outset, what was afterwards contemplated, and what did occur at various times, in carrying it to perfection.

We are to consider, also, the nature of the business in which Mr. Place was engaged, and in which he expected to be engaged, and the society and style in which he lived and expected to live, and its necessary expenses. These all enter into the question we are to determine. A family provision which would still leave the donor in the ownership of an unencumbered estate of $100,000, would, in some parts of the country, and under some circumstances, be deemed to be, and be, in fact, a reasonable transaction. It would be supposed that an ample provision against all contingencies had been retained by the donor. This, however, might be differently decided, where the business of the settlor was extensive and hazardous, or where the family residence should cost $100,000, and where $20,000 or $30,000 annually would be required, by the usages of society, to maintain the establishment. The sum named would go but a little ways, either to support the fashion and luxury of a large city, or to meet the fluctuations and necessities of a business in which the existence of millions of debt gave no anxiety to the debtor. The economy of country life is not to furnish a standard for the measure of city life, nor is the enlarged business or private establishment of a city merchant to stand as it would in the simplicity of the country.

The time when the transfer to his wife was made by Mr. Place, with reference to the old and to the new business in which he was concerned, and the practical effect of the conveyance, are, also, to be considered.

In examining the condition of Mr. Place's affairs, a convenient starting point is found, in the dissolution of the old firm of J. K. & E. B. Place and the formation of the new firm of J. K. Place & Co. This occurred on the 1st of December, 1865. A statement of affairs was then made, for the purpose of a settlement, and it is sufficiently near to the time of the purchase of the Fifth avenue property, to furnish a standard of reasonable accuracy.

It is difficult to say, upon the proofs, whether the transfer from Wallis to Mrs. Place was actually made in December, 1865, or not until April, 1866. The plaintiff's proofs on that subject consist in the fact that the transfer to Wallis, and from him to Mrs. Place, were not recorded until the month of April, 1866, and in the argument, that a careful lawyer like Mr. Wallis would not be justified in retaining such papers unrecorded, and would not be likely to do so, and in the evidence of the fact that, in the bill for professional services rendered by Mr. Wallis to Mr. Place up to January 1st, 1866, no charge was found for examining the title, or drawing the transfers, respecting this property, while the charges on this subject were contained in a bill presented subsequently to April, 1866. The recollection and statements of Mr. Place, as found in his testimony, are not as positive and distinct as might be wished. The testimony of Mr. Wallis on the point is not taken, and no reason appears in the case why either party should be unwilling to call him. The difference of payments between December 1st, 1865, and January 1st, 1866, appears, by the books, to be $1,746.09. The amount paid between January 1st, 1866, and April 18th of that year, I am not able to discover. I cannot perceive that any important result would be attained by antedating the transfer by Mr. Place to his wife, from April, 1866, to December, 1865. The burden of proof on the point rests upon the party alleging the fraud or the error. I am not prepared to say that this has been proved, and I shall consider the transfer as having been made when it bears date, viz., December, 1865.

The theory of Mr. Place's counsel is this— that, on the dissolution of the firm of J. K. & E. B. Place, December 1st, 1865, the books of that concern showed him to be worth $227.000: that the merchandise of the firm was sold to their successors for the sum of $1,474,000; that their accounts were transferred to the new firm, to collect and pay the debts of the old firm, the new firm undertaking to liquidate, as it is technically expressed; that, within 60 or 90 days, 98 per cent. of these debts were collected, and enough to pay all the debts of the firm, except $30,000 or $40,000 due to Anderson & Ten Broeck, which debts were afterwards paid by E. B. Place; that the share coming to E. B. Place was about $300,000, and that to Sparkman $262,000; that James K. Place's interest in the spice concern of Place & Turlay was about $20,000; that obligations for building the Fifth avenue house, to $50,000 or $60,000, had been incurred by him; and that, after the payment of all his debts, James K. Place had an estate of the value of from $150,000 to $200,000. This is Mr. Place's own estimate, as given in his testimony. It appears, also, from the statements of Mr. Place, that the actual expense of the Fifth avenue building, and his liabilities arising out of it, were much larger than he had anticipated.

The failure of Mr. Place and his new firm, in November, 1867, is explained, first, by losses in the sugar refining business, amounting to $250,000; a loss of $30,000 of capital in the cork business; a loss by loans to the same concern of $200,000; and a loss in the value of goods, caused by fluctuation in the gold market, the last item amounting to $175,000 in the first thirteen months of the existence of the firm of J. K. Place & Co.

This theory is attacked by the assignee's counsel in various modes. 1 is insisted, that the "trial balance" of November 30th, 1865, shows an indebtedness of the firm of $3,842,-

000. and that the bills payable alone amounted to $1.246.777. The nominal assets, it is said, amounted to $4.500,000, including the Turlay & Place investment at $60,000, and the Fifth avenue property at $10,000. The merchandise was valued, it is said, by adding to the currency valuation the premium of 48 per cent. for gold, while gold fell to 33 by the end of the year 1866. The brief and the argument of the assignee's counsel in relation to the details of the business of the firm, its situation in December. 1865, and its proceedings afterwards, are exhaustive. It is not necessary to follow them. The result of the business was, that, at the end of the first third of the year, 1866, the condition of the firm was greatly altered for the worse, 1st, by their loss in gold; 2d, by their unsecured endorsements to a large amount for Place & Turlay; and 3d, by the purchase of the interest of E. B. Place in the Turlay concern; and, at the expiration of the year, the firm of J. K. Place & Co. was practically insolvent. It kept up its business by loans and renewals, living on the strength of its former good character. There was no technical failure, but it is manifest that the substance was being eaten out day by day, and that little more than the shell then remained. The struggle was maintained until November, 1867. when it was abandoned. During the whole of this year, the contest was maintained. doubtless with the hope and expectation that the firm could overcome the difficulties surrounding it, maintain its credit, and retrieve its affairs. The burden, however, was too great, and the absolute open failure took place on the 19th of November, 1867.

Two concurrent sets of facts are strikingly significant. They run side by side from September. 1865, to November, 1867. The first set arises out of the purchase, in September, 1865, of the Fifth avenue lots, and the payment for the same, in that month, of $5.000, to Mr. Livingston. Up to December 31st. 1865. Mr. Place paid $11,774.44 on account of this purchase and its improvement. By December 31st. 1866, the sum of $61,627 had been thus paid. On the 30th of April. 1867, $82.547.08, and on the 25th of November. in the same year, $95.533.04, had been paid on the same account. These sums were all paid by James K. Place. They were voluntary gifts made by him to his wife, at the dates mentioned. for the purchase and equipment of a house to be occupied by his wife and family, and by himself as a member of that family. The second set of facts arises out of the failing condition of the firm at the times these gifts were made. During the year 1866. the firm lost $175.000 in the single item of gold. During the same year the difficulty with Turlay occurred, by which the capital in that firm was lost, and $200.000 was added to their burdens by endorsements for that firm. which Place's firm knew it would be bound to protect. and by the assumption of E. B. Place's interest of $30,000 in the same establishment.

In the face of these facts, Mr. Place made to his wife the gifts mentioned, to the amount of $50,000, during the year 1866. Assuming that he was worth the sum of $175,000 in December, 1865, as he estimates himself to have been, (he gives it, in his deposition as from $150,000 to $200,000,) invested in the manner and subject to the hazards specified, the occurrence of these losses must have admonished him that his situation was a precarious one. With this moderate fortune, thus hourly wasting away, subject to the expenses of a residence in the city of New York, these gifts to his wife cannot be sustained. They must be regarded as gifts of the property of his creditors, made for his own benefit or for that of his family. No principle of law can sustain them, nor do any of the cases to which my attention has been called justify them.

I am of the opinion, and do decide. that, within the provisions of the bankrupt act, the gift by James K. Place to his wife, of the Fifth avenue lease lot, and the payments thereon made by him, are illegal and void, and that the same must be set aside, and the value thereof applied to the benefit of his creditors, through the assignee in bankruptcy. In this respect, the decree below is erroneous, and must be reversed.

II. As to the Barker mortgage. On the 1st of May, 1867, Mr. and Mrs. Place executed and delivered a mortgage on the Fifth avenue property above described, to Joseph S. Barker, for $30,000. Mrs. Place was, in form, the owner of the property, and the legal title would, perhaps, have been fully passed by the execution of a deed by her alone. It is, however, the practice of prudent men, in such cases, to require the signature of the husband also, to show his assent to the transaction. and to cut off any possible claim, on his part, to the property. Hence, the signature of Mr. Place to the mortgage given by his wife to Barker affords no occasion for criticism.

The title of Mrs. Place, although impeachable by the creditors of her husband, was. in form, perfect. and the law is settled, that a purchaser from her, or a borrower in good faith, and having no knowledge of the weakness of her title, takes a good title. Ledyard v. Butler, 9 Paige, 132; Anderson v. Roberts, 18 Johns. 515; Hall v. Stryker, 27 N. Y. 596.

Mrs. Place was the niece of Mr. Barker. The testimony of the latter shows the transaction to have been an ordinary loan, made on the application of James K. Place, which, after time taken to consider, was accepted by Mr. Barker. and the full amount in cash paid by him, from moneys belonging to him held by J. K. Place & Co., subject to Barker's check. I discover nothing to impeach the good faith of Mr. Barker in making this loan. The decree sustaining this mortgage is right. and must be affirmed.

III. As to the mortgage to Phipps & Co., and its transfer to Bernard and Cullen. The position of Phipps & Co. is essentially differ-

ent from that of Barker. They cannot claim the protection of bona fide purchasers with-out notice. Their proceedings were taken after the failure of the firm of J. K. Place & Co., and the judgment in their suit was entered after the filing of their petition un-der the bankrupt act. It cannot be doubted, that Phipps & Co. were chargeable in law with notice of the defects of Mrs. Place's ti-tle. They took their mortgage, not as lend-ers in good faith upon the security of Mrs. Place's apparent title, but as creditors seek-ing to save a desperate debt, as creditors of one they charged with fraud in contracting a large debt with them, and whose convic-tion of that fraud they succeeded in procur-ing. In prosecuting that proceeding, it is proved by Mr. Place, that the transactions respecting Mrs. Place's title were fully ex-amined by Phipps' counsel, and the accounts on that subject sifted, and the book-keepers called upon to explain the condition of things, and all this before the execution of the mortgage by Mrs. Place. They had knowledge of all the facts in the case. Had Mrs. Place's title been perfect, she could have granted or mortgaged as she pleased, without reference to the condition of her husband, to his firm, or to his creditors. Her title, however, was tainted, and nothing could make it good in her grantee, except his ignorance of its defects, and the payment of a good consideration by him. These ele-ments are wanting in the Phipps mortgage, and it cannot be sustained. The decree sus-taining it must be reversed. These observa-tions apply as well to the furniture em-braced in the mortgage of Phipps as to the real estate.

IV. Cullen was assignee of Mr. Place in the Phipps proceeding, under the act to abolish imprisonment for debt, already re-ferred to, by an assignment dated January 25th, 1868. Under an execution issued on this judgment, the sheriff sold to Bernard all the right and interest of Place and Spark-man, or either of them, to the property in question.

There is good reason to hold that all of the proceedings in the Phipps suit, after the giving of Mrs. Place's mortgage to se-cure their debt, (January 23d, 1868,) includ-ing the conviction of fraud, and the assign-ment to Cullen, and the purchase by Ber-nard, were collusively and fraudulently con-trived and transacted for the benefit of Mr. Place. It is hardly possible to reach a dif-ferent conclusion, upon a careful reading of the evidence. Bernard's title, was, also, too late, inasmuch as the bankrupt proceeding was commenced before his purchase took place. The decree that Bernard and Cullen have no interest in the property described, should be affirmed.

V. Under these views, the executors of Mrs. Susan A. Place have no rights or in-terests, as owners of the equity of redemp-tion of the Fifth avenue estate.

VI. As to the 43d street lots, and the judg-ment against the executors of Susan A. Place for the value thereof. The decision, that the conveyance to Mrs. Place by her husband, of the Fifth avenue property, was fraudulent, decides the question as to the 43d street lots. These lots were conveyed to Mrs. Place in May, 1867, by her husband, through his agent, Mr. Wallis, and the sum of $10,500, was paid as the consideration therefor. This sum, thus paid by Mrs. Place, was obtained upon a mortgage of the Fifth avenue property. It was a part of the amount received from Joseph S. Barker. Her husband received $10,500 of this money, and accounted to Mrs. Place therefor, by the transfer of these lots. The money thus paid by Mrs. Place to her husband was the mon-ey of the creditors. She held it for the as-signee in bankruptcy; and the fund into which she transferred it, to wit, these lots, by a well settled rule of equity, became the property of the assignee. Had it remained in specie in Mrs. Place's hands, it could have been recovered by the assignee. She, however, sold the 43d street lots to Anthony McReynolds, in June, 1868, and, as the mas-ter found, received in value therefor the amount of $4,000. The court below raised this sum to $16,000, and ordered judgment for that amount. I think this revaluation is right. The deed from Mrs. Place to Mc-Reynolds recited that the property was sold for $16,000, and that she received that sum therefor. This recital is evidence, although not conclusive. So far as I can ascertain, there is nothing to diminish its force or to impeach it. There is a mysterious transac-tion with Jane C. Place, by which certain property is conveyed to her by McReynolds, respecting which, or the real transaction in-volved, no satisfactory information is given.

I am of the opinion, that the decree holding the executors of Mrs. Place liable should be affirmed; that they are liable, also, for the value of the substituted property received by Mrs. Place; and that such value is properly fixed at $16,000.

VII. As to the conveyance of the 42d street property to Mrs. Sparkman. By instruments bearing date about December, 1865, James D. Sparkman conveyed to his wife, Mary A., cer-tain premises situated on 42d street, in the city of New York. The property constituted the family residence, and, with the furniture, was valued at $60,000. Mr. Sparkman con-tinued to occupy the premises as a residence, until October, 1868. In October, 1868, the ex-ecutor sold this property to Mr. Preble for $60,-000, in part payment for which a mortgage of $40,000 was given, which remains in the hands of the executor. This settlement on the wife, together with $40,000 of government bonds, at the same time, was made because Sparkman was about to embark in business as a general partner, and was well advanced in years, and he desired to secure to her the sum of $100,-000, by the conveyance of the 42d street prop-

erty and the furniture, carriage and horses used by him, and $40,000 in government bonds.

It is alleged and conceded, in the briefs of the counsel respectively on this question, that the firm of J. K. & E. B. Place owed $3,480,-000. Their assets on paper were $4,500,000. They were succeeded by the firm of J. K. Place & Co., of which firm Mr. Sparkman was a general partner. It is claimed, on the part of Mr Sparkman, that he was worth $200,000, independently of his interest in the firm. The statements heretofore made respecting the affairs of James K. Place bear upon the present point, and the principles of law there stated are also applicable to it. They need not be recapitulated. Each member of the firm took the same occasion to make a settlement upon his wife, and apparently governed by the same principles. At the time of the dissolution of the firm of J. K. & E. B. Place, Sparkman was indebted individually in about the amount of $20,000. The debts and assets of the new firm have beeen stated. The career of the new firm, of which Sparkman was a general partner, until its final failure in November, 1867, has also been stated. The other concerns in which he was interested, and which were, in fact, bound up in, and dependent upon, J. K. Place & Co., soon went down together. The firms of Sparkman, Truslow & Co., and of Sparkman, Place & King, no longer existed. His interest in the Manufacturers' Bank stock was diminished one-half by these occurrences. The rest of his property was entirely swept away, and he was left a bankrupt. The conveyance in question to his wife, and the alleged transfer of the government bonds, were made to his wife while she was quite ill; and her will was immediately made, giving the benefit of the whole property to Mr. Sparkman during his life, and after his death to his children, who were not her children, and she died in June, 1866. The evidence shows that Mr. Sparkman occupied the house and furniture after the conveyance to his wife, as before. It fails to show that the bonds were delivered to Mrs. Sparkman, or to any one in her behalf, before her death. It appears that they were kept in the safe of her husband's firm; that they were used by the firm as their own property; that they were repeatedly pledged by them for loans for their firm; and that no actual possession was taken of them by Mrs. Sparkman's executor until the failure of the firm, in November, 1867. It is evident that the intent of Mr. Sparkman was to secure himself and family against the fluctuations of the large enterprises in which he was engaged and was about to engage. He owed very large sums. He expected to owe still larger sums, as he then became a general partner. He was about to embark in a new business. He was advanced in years. He intended to appropriate a portion of his property to provide a refuge for himself and family in the event of an unfortunate result to his enterprises. He incurs a new indebtedness of several millions of dollars by his general partner-

ship, he unites in a sugar refining speculation, he carries on a boot and shoe business, he carries on a large and embarrassed cork factory, and he becomes a partner in business with Taylor and Young. He was in very deep water. His enterprises, in fact, were unsound, and all of them came to disastrous ends. At the moment of embarking in the most hazardous of these enterprises, he sets aside $100,000 for his wife. The wife then has a fatal sickness upon her, from which she soon dies. She makes a will giving to him for life the use of the property, and the remainder to his children after his death. The property conveyed is occupied by him as before. The bonds forming a part of the gift are used by the donor's firm as their own, are repeatedly hypothecated for their benefit, and are not claimed by, or delivered to, the executor until the failure of the firm, in November, 1867, when the firm borrows money to take them out of pledge and deliver them to the executor. These acts and doings of the donor and those representing him, furnish pregnant evidence of the intent of the donor. Allen v. Massey, 17 Wall. [84 U. S.] 351. Unless the authority of Case v. Phelps, Savage v. Murphy, Carpenter v. Roe, and Robinson v. Stewart (10 N. Y. 190), be denied, the transaction must, in all its parts, be adjudged to be fraudulent. I have no difficulty in concurring with the court below in vacating these transfers to Mrs. Sparkman by her husband, and declaring the title to be in the plaintiff, and that Mrs. Sparkman's executors must account to the assignee. The decree on this point is affirmed. Miller v. O'Brien [Case No. 9,586]; Case v. Phelps, 39 N. Y. 164; Carpenter v. Roe, 10 N. Y. 227; Savage v. Murphy, 34 N. Y. 508; Robinson v. Stewart, 10 N. Y. 190; Parish v. Murphree, 13 How. [54 U. S.] 92; and cases supra.

As the court of appeals of the state of New York now holds, it was error to fix the rule of damages at the highest market price of the bonds up to the time of the trial. Baker v. Drake. 53 N. Y. 211. It should have been their value when sold. This must be the principle to govern the rule of damages, and to this extent the decree is modified.