79 653
86 558
79 653
106 99

# CHARLOTTE SHOWMAN v. HIRAM N. LEE AND GEORGE VAN WAGNER.

*Married women—Contracts—Trustee—Evidence—Chattel mortgage—Exemptions.*

1. In Michigan, a married woman's contracts are only *voidable* at her election, and the defense of coverture is a personal privilege, which neither co-defendants nor strangers can interpose for her.

   So *held*, where a married woman, who was engaged in business on her own account, in order to secure a debt due her, indorsed the debtor's notes to other creditors, and took a chattel mortgage on his stock of goods, conditioned for the payment of her claim, and also to save her harmless on account of such indorsements. An unsecured creditor attached the goods, and she brought an action of trover against the attaching officers for their value, and on the trial it was claimed, as a defense, that she was not legally liable on her indorsements, and that to that extent the mortgage was inoperative; and it is held that such defense could not be interposed without her consent, and that she had a right to fulfill her contract of indorsement, although a married woman.

2. A married woman may be an agent or attorney either for her husband, or a stranger, or third person, and she may be a trustee, which is but another agency, in fact.

   So *held*, where a married woman indorsed the notes of her debtor, which were signed by her husband as surety, and, to save herself from loss on account of such indorsements, took a chattel mortgage from the debtor on his stock of goods; and in a suit by her against an attaching creditor for the value of the goods it is held that the transaction made her a trustee of the mortgaged property, so far as the creditors were concerned whose notes she had indorsed, and clothed her with a duty to see that the avails were applied to the payment of said indorsed notes, and that she held the legal title to the mortgage not only for this purpose, but directly for the benefit of her husband, as such surety, who had a right to the protection of the mortgage, and that she could recover the full amount covered by the condition of the mortgage.

3. Where a *mortgaged* stock of goods is seized at the suit of attaching creditors, and the sheriff sets off to the mortgagor his

statutory exemptions without authority from the mortgagee, or a ratification of such act with full knowledge of what has been done, the mortgagee's rights are not affected by such selection, and the question of such authorization or ratification is for the jury.

4. Evidence of the price goods brought at auction (execution sale) eight months after their conversion is too remote to be admissible as proof of their market value at the time of such conversion, without some testimony showing that such value had not decreased during that time.

Error to Ionia. (Smith, J.) Argued January 15, 1890. Decided April 11, 1890.

Trover. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Griffin, Warner, Hunt & Berry,* for appellant.

*Davis · & Nichols (Fletcher & Wanty,* of counsel), for defendants.

CHAMPLIN, C. J. Prior to February 3, 1888, Willis M. Elder had been engaged in business at Portland, Mich., as a retail dealer in drugs, medicines, groceries, crockery, and glassware, and other miscellaneous goods such as are usually kept in village retail stores. In the fall of 1887, at a time when he was considerably involved in debt, he traded off his stock of merchandise for land in Tuscola county. Afterwards, claiming that he had been defrauded in the transaction, he replevied the stock of goods, but found himself unable to furnish the requisite bond. February 3, 1888, was the last day on which he could, under the law, give bond to the sheriff. There were at that time several of his creditors present by their attorneys at Portland, who were pressing him for the payment of their claims. He also owed Mrs. L. K. Showman, the plaintiff in this suit, $1,710 for borrowed money, for which she held no security. Mrs. Showman

was his mother-in-law. He found that he could settle the replevin suit, and the matter out of which it grew, and repossess himself of the stock of goods, by paying to the party defendant in that suit $800, but he had no means of his own to do so. Mrs. Showman desired security for what he owed her. The other creditors represented there, whose claims amounted to over $2,000, required payment or security. Mrs. Showman had previously indorsed two notes for him—one of $200, and another of $100—which had not been paid.

It was finally arranged that Elder should give his notes to the creditors, signed by himself, and by Mr. L. K. Showman, his father-in-law, who was perfectly responsible for the amount of the several notes, as surety; such notes to be made payable to Mrs. L. K. Showman, and to be indorsed by her, at four months' time. Another like note, for $900, payable on demand, to enable Elder to settle the suit, and repossess himself of the stock, and a note due in 30 days, for the indebtedness then due from him to Mrs. Showman, for $1,710, should be given to her by Elder. And to secure all of this indebtedness, Elder was to execute to Mrs. L. K. Showman a chattel mortgage upon the entire stock of merchandise and store fixtures, including a soda fountain. This arrangement was executed on February 3, 1888, and the chattel mortgage was duly filed on the same day. The total amount of the indebtedness secured by the mortgage was $4,920.52.

The condition contained in the mortgage reads as follows:

"Provided, always, and these presents are upon this express condition, that if the said party of the first part shall and do well and truly pay, or cause to be paid, to the said party of the second part, the sum of seventeen hundred and ten and no 100 dollars, within thirty days after date, also to protect and save said second party harmless from all indorsements she has this day made and

signed and indorsed, and that she has heretofore made
and indorsed, for said first party, amounting to thirty-
two hundred ten and 52-100 dollars, according to a cer-
tain promissory note bearing even date herewith, executed
by said first party to the said party of the second part, also
all notes signed by said first party alone, or jointly with
L. K. Showman, bearing said second party's indorsement,
then these presents and said notes shall cease, and be
null and void. And the said party of the first part hereby
expressly covenants, promises, and agrees with said party
of the second part to pay the said sum of forty-nine hun-
dred twenty and 52-100 dollars, and interest thereon, as
above provided."

The value of the stock of goods covered by the mort-
gage is variously estimated from $4,500 to $7,000. Elder
was, at the time the mortgage was executed, indebted to
several creditors, other than those intended to be secured
by it, to the amount of $2,000 and over. It is claimed
by Mrs. Showman that she entered into the transaction,
and indorsed the several notes which were delivered to
the creditors on that day, in order to obtain security for
the $1,710 which Elder was owing to her, and that the
intention was to pay the indorsed paper, as well as the
indebtedness to her, out of the avails of the sale of the
goods, and, if this was insufficient, to pay it out of her
own property.

Elder, on taking possession and resuming business,
made sales, and paid the $900 and the $100 note, and
deposited in a banking-house at Portland money at four
different times, for which he took certificates of deposit
payable to Mrs. Showman, and delivered the same to her.
He also paid her $126 in cash out of the avails of sales of
goods. The certificates and this money amounted to
$744.

On April 6, 1888, Mr. Tufts, one of the unsecured
creditors of Elder, commenced suit by attachment; and
the defendants, who were at the time the sheriff and

deputy-sheriff of Ionia county, seized all of the goods covered by the chattel mortgage, removed them from the store, and inventoried them. On the 18th and again on the 19th of April, 1888, the plaintiff, Mrs. Showman, demanded the goods of the defendants, and they refused to deliver them to her. She elected to treat this refusal as a conversion of the goods by the defendants, and June 5, 1888, brought this action in trover for the value of the goods so converted. The trial in the court below resulted in her favor; the jury returning a verdict for $991.35, for which judgment was rendered. She brings the case here by writ of error.

It was strenuously urged in the court below that the mortgage was fraudulent, though upon what testimony we do not perceive. A reading of the record impresses us with the entire good faith of the transaction; and so, under the charge of the court, the jury must have found it to have been given, for they upheld the validity of the mortgage to the amount stated above.

The most important question raised by this record is whether the mortgage is a valid security for the notes indorsed by Mrs. Showman. It is claimed by the defendants' counsel that, Mrs. Showman being a married woman, her indorsements, under the circumstances above stated, are utterly null and void, and hence there is nothing for that portion of the mortgage to secure, and that, as she never was legally liable to pay the notes so indorsed by her, she cannot be allowed in this action to recover damages as if she were legally liable to pay such notes. The court instructed the jury, in effect, upon this point, in accordance with the law as claimed by defendants. He submitted to the jury, however, as a question of fact, whether the indorsements made by her related to, and appertained to, her separate property, and were made in order to obtain security for her own debt; and the court said:

"If she obtained the security because of the indorsements, deeming it at the time for the interest of her estate to make the arrangement, and intending to bind her estate by the contracts of indorsement, then she would be liable on the indorsements, and the amounts she has paid, by reason of the indorsements, in taking up the paper, should be considered by the jury in determining the amount of her recovery."

It is, perhaps, proper to state here that the testimony showed that Mrs. Showman was, and had been for a long time, engaged in the millinery business at Portland on her own account, and was possessed of both real and personal estate in her own right. It also appeared that between the time the goods were seized by the sheriff, and the time of the trial, which occurred in January, 1889, she had paid and taken up, or otherwise provided for, all of the notes upon which she was indorser, and intended to have been secured by the chattel mortgage.

At the common law, married women were incapable of entering into contracts. It was broadly asserted under that law that her contracts were null and void. She could neither sue nor be sued upon a contract. But our Constitution and statutes have modified the doctrine of the common law, and removed the incapacity, so far as contracts relating to her own separate property are concerned. She may also sue and be sued upon contracts entered into by her. The modern doctrine growing out of such removal, is that contracts entered into by married women are not utterly void, but voidable, and the defense of coverture is a personal privilege, which she may interpose or not, as she may choose; and, if she does not set it up, a judgment rendered upon her contract, although not in reference to her sole property or separate estate, is valid and binding upon her personally. *Smith v. Dunning*, 61 N. Y. 249; *Insurance Co. v. Baker*, 71 Ind. 102; *Wilson v. Coolidge*, 42 Mich. 112 (3 N. W. Rep. 285).

Neither co-defendants nor strangers can interpose the defense of coverture. *Insurance Co. v. Baker, supra,* was a case where the insurance company was sued with a married woman, and sought to set up the defense that the contract was entered into by a married woman, and was not binding. She was personally served, but made no defense, and was defaulted. The court said:

"The plea of coverture might possibly have constituted a valid defense for Mrs. Ellsworth, the appellant's co-defendant, if it had been pleaded by her to this action; but, certainly, her coverture was not an available defense to her co-defendant, the appellant. Coverture, like infancy, is a personal defense, which the party may or may not plead, as she sees fit; but, if not pleaded by her, it cannot be made an available defense to or by any of her co-parties."

In this case, it does not lie within the province of the defendants, nor the creditor whom they represent, to interpose the objection of coverture for Mrs. Showman, and against her wishes, and without her consent. She has a right to fulfill her contract of indorsement, although she be a married woman. She is a woman engaged in business upon her own account, and may be presumed to have some concern for her personal credit and commercial honor in the business community; and it does not rest in the will or wish of any third person to say that she shall not fulfill her business engagements, or pay commercial paper which she has indorsed. The evidence shows she has paid such paper protected by this mortgage. The mortgagor has not, and could not, object to the mortgage being held as security by her for such indorsements, and third parties have no right to object, so long as it was not made with intent to defraud them.

In another view of the relation of these parties to the mortgage, the instructions of the court were wrong. A married woman, like any other person, may be an agent

or attorney either for her husband, or a stranger, or third person. Coverture takes from her none of her capacity in this respect. She may also be a trustee, which is but another agency, in fact. Cord, Mar. Wom. §§ 1305, 1310. The transaction of February 3, 1888, so far as the indebtedness due to other parties than herself, namely, that part which is in issue, is concerned, was, in effect, to make Mrs. Showman a trustee of the mortgaged property, and clothed her with a duty to see that the avails were applied to the payment of those notes which were secured by it. She was clothed with the legal title. She held the legal title to the chattel mortgage not only remotely for the benefit of such creditors, but directly for the benefit of Mr. Showman, who was a surety upon the notes. He had a right to the protection of this security. Had the mortgage run to Mr. Showman, with the same conditions as are expressed in this mortgage, no one would have challenged its entire validity. How is its validity affected because it runs to her instead of to him? Either would be a trustee for the benefit of the sureties upon the notes. We think the plaintiff was entitled to recover to the full amount covered by the condition of the mortgage, less what had been paid before the seizure.

It was a proper question of fact, for the jury to determine, whether the plaintiff authorized the sheriff to set out the exemptions to the mortgagor, or whether, if she did not authorize, she ratified, what had been done in that respect. Unless she authorized the sheriff to set out such exemptions, or, after it was done, ratified the act, with a full knowledge of what had been done, her rights would not be affected by it, and no reduction could be made from her damages because of such selection. There was testimony from which the jury might have inferred an assent or ratification.

The goods were appraised by sworn appraisers selected by defendants at the time of seizure, who appraised the goods at $2,206.05. The plaintiff's testimony tended to show that the value of the stock at the time of the conversion was from $3,500 to $4,500. The court permitted defendants to show what the stock sold for at public auction in December, 8 months after the conversion, as bearing upon the measure of damages. There was testimony tending to show that some of the goods sold at the auction at a fair value, and it also showed that some of the goods were sold in "a lump" and not separately, as appraised. The total sum for which they sold was $1,050, or less than one-half the sum which their own appraisers fixed as their value in April preceding. The rule of damages was the market value of the goods at the time and place of conversion. While a sale at auction is some evidence of market value[1] at the time and place of sale, in this case we think it was too remote in point of time, without some testimony showing that the market value of such goods was not less in December than it was in the previous April. If the defendants' own appraisal was a fair one, and they did not question it, it is evident that the goods were sacrificed at the auction sale, or the market value had fallen prodigiously in 8 months; and, without some testimony explaining the discrepancy, it should have been ruled out. *French v. Fitch*, 67 Mich. 492 (35 N. W. Rep. 258).

The judgment must be reversed, and a new trial granted.

MORSE, LONG, and GRANT, JJ., concurred.

[1] See *Hutchinson v. Poyer*, 78 Mich. 337.