CHARLOTTE SHOWMAN v. HIRAM N. LEE AND GEORGE VAN WAGNER.

[See 79 Mich. 653.]

*Fraudulent conveyances—Chattel mortgage—Evidence—Conversion —Measure of damages.*

1. Parties who take security from insolvents, or from persons who are indebted to others, must act in good faith, and in such a manner as not unnecessarily to hinder, delay, or deceive other creditors; and taking a mortgage for an amount in excess of the debt or of the assumed liability is a badge of fraud, and is a fraud in law if the purpose is to protect the mortgagor's interest from other creditors; citing *King v. Hubbell*, 42 Mich. 597.

2. The honesty of one of two mortgagees will not save the mortgage, if there was any fraud or wrong in the other; citing *Adams v. Niemann*, 46 Mich. 135.

3. Parol testimony is admissible to show to whom a deed or mortgage ran, and, if material, in whose custody the instruments were placed; citing *Clemens v. Conrad*, 19 Mich. 170.

4. The measure of damages in a trover suit brought by a mortgagee against an attaching creditor is the market value of the property at time of its seizure, not exceeding, however, the amount of the mortgage lien.

5. Invoices of goods show their cost, rather than value, and are not the *best* evidence of the market value of the goods.

6. In this case it is held that the market value of a general stock of drugs is the cost of replacing it with a like stock at the time of its seizure, and not what it could be sold for as a whole to an occasional purchaser, who would buy only because he saw a large margin in the purchase.

7. A witness who testifies that he has been in the drug business for a number of years, and is very familiar with a stock of drugs, which he assisted in inventorying at time of their purchase, and is acquainted with the value of such goods, is competent to testify as to their market value.

Error to Ionia. (Smith, J.) Argued June 11 and 12, 1891. Decided July 28, 1891.

Trover. Defendants bring error. Affirmed. The facts are stated in the opinion.

*Davis & Nichols* (*Fletcher & Wanty*, of counsel), for appellants, contended:

1. The court erred in refusing to submit to the jury the question of estoppel; citing *Faxton v. Faxon*, 28 Mich. 159; *Thompson v. Howard*, 31 Id. 309; *Vanneter v. Crossman*, 42 Id. 465; *Robb v. Shephard*, 50 Id. 189; *Clark v. Lee*, 78 Id. 221; *Horn v. Cole*, 51 N. H. 287; *Roe v. Jerome*, 18 Conn. 138; *Short v. Currier*, 150 Mass. 372; *Dickerson v. Colgrove*, 100 U. S. 578.

2. One who has merely been in the store without inspecting the goods is not competent to express an opinion as to value; citing *Dyer v. Rosenthal*, 45 Mich. 588.

3. The measure of plaintiff's damages was the market value of the goods taken at time of the trespass; citing *Hunt v. Strew*, 33 Mich. 89; *Worthington v. Hanna*, 23 Id. 531; *Walrath v. Campbell*, 28 Id. 117; *Dyer v. Rosenthal*, 45 Id. 588; *Densmore v. Mathews*, 58 Id. 624; and the retail price of a drug stock is

not the market value, as applied to a mortgagee's damages for conversion.

*Griffin, Warner & Hunt,* for plaintiff.

McGRATH, J. This is a suit in trover against the sheriff and deputy-sheriff of Ionia county, for seizing and converting a certain stock of goods in the village of Portland, upon which plaintiff had a chattel mortgage amounting to the sum of $4,920.52.

The case has been twice tried. An appeal was taken by the plaintiff from the first verdict and judgment, and the case is reported in 79 Mich. 653. The case was reversed by this Court, and upon the second trial plaintiff recovered a verdict, from which defendants appeal.

The mortgagor, Willis M. Elder, was plaintiff's son-in-law, and plaintiff resided in his family. The mortgage was given upon. Elder's stock of drugs, silver-ware, crockery, stationery, groceries, and fancy goods. Elder had sold the stock to one Williamson, who had taken possession, but Elder replevined it, and then certain of his creditors attached. Elder compromised with Williamson, gave the attaching creditors notes indorsed by plaintiff and her husband, and took possession of the stock. To secure plaintiff for the indorsements and the payment to her of an indebtedness claimed to be due to her, Elder, on February 3, 1888, executed to her a mortgage on his stock and fixtures for $4,920.52. The indorsed notes aggregated $3,210.52, and the amount claimed to be due plaintiff was $1,710, making a total of $4,920.52.

Elder continued in business until some time in March, when he went West, leaving his brother in charge of his stock. His object in going West is thus explained by plaintiff:

"I suppose it was more especially my desire to have my daughters nearer together. One of them was already

at Spokane Falls. And it occurred to me that as the stock was run down, and we hadn't very good success in selling it as a bulk, and we would have to sell it at a sacrifice, the best thing to do was to ship it, in case he would be satisfied to locate there; and Willis went West to see if he could be satisfied, and, if he sold the stock, he was to follow some other business; but my money was still in it, and I knew of no better way to get it, and thought the better way was to ship the stock. It was for the purpose of getting out of it what it was worth, and by adding more to it. I had no intention of defrauding Elder's creditors in any way."

Before leaving, Elder paid two of the indorsed notes, amounting to $1,000, and had paid to plaintiff $774. Elder finally concluded to locate at Spokane Falls, Washington Territory, and on April 6 the goods were being packed preparatory to shipment to him.

Tufts, a creditor, took out a writ of attachment on the last-named date, upon which defendants seized the goods. Judgment was recovered in the attachment suit, November 18, 1888, and the goods were sold at sheriff's sale, under a levy, in December, 1888. Plaintiff filed the usual declaration in trover. Defendants gave notice of justification under the attachment proceedings in *Tufts v. Elder*. Plaintiff and Elder testified to the indebtedness of Elder to plaintiff, to the indorsement of the notes by plaintiff and her husband, to the payment of two notes, amounting to $1,000, and the sum of $774, by Elder, and to the payment of the other indorsed notes, amounting to $2,210.52, by plaintiff.

Forty-three errors are assigned. We shall only refer to such as have been discussed by appellants' brief.

Counsel for defendants requested the court to instruct the jury as follows:

" The plaintiff bases her action in this case upon an alleged chattel-mortgage interest in a stock of goods which were owned by Willis M. Elder, and which she

claims the defendants have converted to their own use by taking them under an attachment, and she cannot recover in this case unless it appear from the evidence that, at the time the defendants levied the attachment upon the goods, she had a valid, subsisting chattel-mortgage interest in the goods so levied upon."

It is only necessary to say that this request was very fully covered by the instruction given.

The court instructed the jury that, in any event, the mortgage was good for the amount of the indorsed notes, whether the personal indebtedness was *bona fide* or not. This was error. Parties who take security from insolvents, or from parties who are indebted to others, must act in good faith, and so as not unnecessarily to hinder, delay, or deceive other creditors. The taking of a mortgage for an amount in excess of the debt of the assumed liability is a badge of fraud, and it is a fraud in law if the purpose is to protect the debtor's interest from other creditors. *King v. Hubbell*, 42 Mich. 597. To say that a party who assumes a liability may take a mortgage in excess of the amount necessary for his security, for the purpose of hiding the debtor's interest from other creditors, and, when the fraud is exposed, may have the benefit of the mortgage to protect himself, would open the door to gross abuses.

Nor does the fact that plaintiff's husband, as co-indorser, was interested in the security, make any difference in the application of the rule. In *Adams v. Niemann*, 46 Mich., 135, it was held that the honesty of one of two mortgagees would not save the instrument, if there was any fraud or wrong in the other.

Inasmuch as the jury found, by their verdict for the entire amount, that the personal indebtedness existed at the time the mortgage was given, the defendants were not prejudiced by the instruction.

Referring to the personal indebtedness, the court instructed the jury as follows:

"You can take into consideration all her after acts as bearing upon that question, as to whether she participated in any fraudulent intent upon the part of Elder. If the mortgage was good at the time it was given,—if there was a *bona fide* debt existing at that time, and it was given to secure it,—then the mortgage must stand, no matter what she did, about the time of the seizure, in regard to shipping goods to Washington. If there was a *bona fide* debt, and it was given for the purpose of securing that debt, and she took it for that purpose, then the mortgage must stand for the entire amount."

There was no error in this instruction.

At the time of the seizure in attachment, the goods were being packed preparatory to their shipment to Washington Territory, and before Elder went West he drafted a bill of sale running to plaintiff; but there was no testimony tending to show its execution and delivery, and both were denied. The testimony showed that it was to be used, if at all, to protect plaintiff's interest while the goods were in transit. Defendants claim that when they made the attachment it was because of the attempted removal of the goods, and with full knowledge of plaintiff's claim of a chattel-mortgage lien, but that after the attachment plaintiff claimed title to the property under a bill of sale, and that, not being in possession, the bill of sale was void as against creditors, and that plaintiff was estopped from afterwards claiming under the mortgage; that, had she continued to claim under the mortgage, they had a right to attach subject to it, pay plaintiff's claim, and sell the goods under their levy.

Regarding the question of estoppel, the court instructed the jury as follows:

"Now, as to the claims made by the defendants on the ground of estoppel, I do not think that need trouble

you, or that there is anything shown here by which she is estopped from asserting her real right in this case."

Plaintiff was not in possession of the goods at the time of their seizure, and had no bill of sale of them. Her chattel mortgage was of record, and defendants had actual notice of it. This suit was commenced shortly afterwards, and the sheriff testified that before it was instituted plaintiff demanded the goods from him under her chattel mortgage. The position of defendants was unchanged. Nothing had been done in reliance upon a claim of absolute ownership. Defendants were not misled to their prejudice, and there was no error in the court's instruction to the jury upon the question of estoppel.

Elder was called by plaintiff, and on cross-examination was asked if he did not trade the stock to Williamson for land up north, take a mortgage back to his wife, and then have it transferred to himself. This was objected to, and, when asked by the court to state the purpose of the testimony, counsel for defendants replied:

"We purpose to show that this mortgage was made a cover; that it was made with an attempt to defraud the creditors; that previous to this time, while Elder was indebted to other parties, he disposed of this very stock to another, and, instead of paying Mrs. Showman and these other parties, he transferred it to this other party, and took the consideration in his wife's name, and without any objection from Mrs. Showman. It was one of those acts which we claim go to make up a series of acts to defraud creditors.

. "The Court: This is a part of the same stock that was mortgaged and attached?

"Mr. Davis: Yes sir.

"The Court: And you purpose to show that Mrs. Showman knew that the goods were transferred to this other man, and the consideration was paid back to Elder's wife; and under that statement I guess you may go on. If you don't make that showing, I will strike it out."

The witness then testified that the consideration of the sale to Williamson was $12,500, and that Williamson was to give witness a mortgage and land. The witness was then asked, "Did you take it in your own name?" but the court held that that could not be shown without the papers. Counsel then asked the witness whether the papers were turned over to witness or his wife, or kept by the witness, but the court held that that was unimportant, and excluded the testimony; and it is to this ruling that exception is taken.

It was competent for defendants to show by parol to whom the deed or mortgage ran (*Clemens v. Conrad,* 19 Mich. 170), and, if material, it was entirely proper to follow up the question of the custody of the papers. But there was no evidence tending to show that plaintiff had any knowledge of this transaction, and the matter was not referred to upon her cross-examination. Elder testifies that he had no talk with plaintiff about this transaction. It may be said that it would tend to show that Elder was not indebted to plaintiff at that time. But would the sale of her son-in-law's property, and the transfer of the consideration to her daughter, without objection by her, tend in the slightest degree to show that at that time Elder was not indebted to her? I think not. It was not shown that Williamson had in fact conveyed any land or given any mortgage; and, too, the fact appears that Elder replevined the stock from Williamson, presumably because Williamson had not performed.

It is contended that under the admissible evidence in the case the judgment is excessive.

The court admitted testimony with respect to the value of the goods at the time of the seizure. The appraisal made under the sheriff's directions was admitted, and the court permitted the defendants to show what the goods

brought at auction sale. The court instructed the jury that plaintiff was entitled to recover the market value of the goods at the time of the seizure, but not to exceed the amount of plaintiff's claim, and that in determining the value they were entitled to consider all the testimony bearing upon that question. There was no error in this instruction.

Counsel for defendants requested the court to instruct the jury as follows:

"1. If the jury find that the plaintiff is entitled to recover, then, in arriving at the amount of your verdict, you must take into consideration the market value of the goods in question at the time of the seizure; and, in arriving at this market value, you have the right to consider the question as to whether the condition of the goods had changed between the date of the seizure and the date of the sale, and you may also consider, in this connection, the amount that these goods brought at public auction under the execution sale as bearing upon this question, as bearing upon the market value at the time of the seizure, and upon the amount of your verdict.

"2. If you find from the evidence the plaintiff was entitled to recover, she can only recover the actual value of the goods at the time of the seizure; and when arriving at this value you have the right to take into consideration all the evidence in the case as to character and condition of goods,—whether new or second-hand, or in good or bad condition, and also the evidence of the length of time the goods have been in stock, how they have been used, and how long in stock, and the fact that they have passed from hand to hand for a number of years.

"3. The extent of the plaintiff's recovery must not exceed what it will be found she could have sold the goods for under chattel mortgage if she had taken the foreclosure proceeding thereon. In other words, she is not entitled to recover what these goods might bring at retail, but would be limited to the amount the goods would bring upon the market at forced sale under her chattel mortgage."

The court gave the requests numbered one and two, but declined to give number three. There was no testi-

mony which tended to show that the values put upon the stock were the retail values or prices. The "price-lists" were referred to by the witnesses, and these are not usually made up by the retailer. If it was so in this instance, it was counsel's duty to draw it out. It is not the rule that plaintiff was limited in her recovery to what the goods would bring upon the market at forced sale under her chattel mortgage. Such an instruction would simply set the jury to guessing. Mortgagees are in a situation to protect themselves against sacrifice at a forced sale, and parties who take the mortgaged property wrongfully cannot be permitted to deprive them of that right.

Counsel for defendants requested the court to instruct the jury that—

"The jury are instructed that the burden of proof is upon the plaintiff to show the value of the goods in question at the time of the seizure under the attachment; that it is the duty of the plaintiff to present the best obtainable evidence of such value, and the jury, have the right to consider whether or not the plaintiff has pro-duced the best evidence within her control showing such value; and that if she has failed to produce the evidence within her power, such as books of account, bills paya-ble, invoices of goods, and cash accounts, and has relied upon inferior evidence to prove such value, the jury have the right to take into consideration such omissions as bearing upon the good faith of the plaintiff."

The plaintiff called, as witnesses to prove the value of the goods, the mortgagor, who had been in the drug business for 15 or 18 years, another witness who had been in the drug business seven or eight years, a phy-sician who had been in the drug business for a number of years before he commenced the practice of medicine, and another witness who had been in the drug business for seven years, and who was one of the appraisers. All of these witnesses were familiar with the stock, and

several of them had taken the inventory made by the sheriff, and from their knowledge of values had carried out and agreed upon the market value of each article. The invoices would show cost, rather than value, and would not have been the best evidence. Again, plaintiff was the mortgagee. She did not have possession of the papers and books. There was no error in the refusal to give this instruction.

Defendants called as a witness one Yeomans, who testified that he had been engaged in a drug store for 24 years, and that he was acquainted with the market value of second-hand drug stocks.

"*Q.* Now, what is the general market value for second-hand drug stocks? Would it be about the same in all cases?

"*A.* There would be a general value to such stock. It would depend a good deal upon how those stocks had been kept up; whether upon shelves, in cases, and so on. There would be a general value, however, to stocks of that kind.

"*Q.* Now, taking the general value into consideration, what would be the market value in relation to the first cost price?"

This was objected to, and the testimony was excluded. This witness knew nothing about this stock, its age or condition. The articles comprising a general stock of drugs have a market value, which is easily determined, but it is well known that a stock of goods which must be sold in bulk has not a corresponding aggregate value. The public generally buy drugs, but few persons desire to buy a stock of drugs. The sale of a bankrupt's stock at 30 cents on the dollar is not a fair measure of value for other goods of the same character. The market value of this stock was what it would cost to replace it with a like stock at the time of the seizure, and not what it could be sold for as a whole to an occasional purchaser,

who would buy only because he saw a large margin in the purchase.

Objection is made to the admission of the testimony of the witness Alton as to the value of the goods; but the witness had testified that he had been in the drug business for a number of years; that he was very familiar with this stock; that he had assisted in making an inventory of the stock when Elder purchased; and that. he was acquainted with the values. Upon this showing, there was no error in admitting his testimony.

Other errors are assigned upon the admission and rejection of testimony involving similar questions, but it is unnecessary to discuss them severally. From a careful examination of them, I am satisfied that defendants were not prejudiced by the rulings of the court.

The judgment is affirmed, with costs to plaintiff.

CHAMPLIN, C. J., MORSE and LONG, JJ., concurred. GRANT, J., did not sit.