DUMMER *v.* SMEDLEY.[1]

1. FRAUDULENT CONVEYANCES — MORTGAGE TO SECURE FUTURE ADVANCES.

> That the whole amount secured by a mortgage was not advanced at the time of its execution does not render it fraudulent as to creditors of the mortgagor, in the absence of an intent to hinder, delay, or defraud creditors, although it does not state on its face that it is given to secure future advances.

2. CORPORATIONS—INCREASE OF CAPITAL STOCK—BONUS TO MORTGAGEE—RIGHTS OF CREDITORS.

> The right of a corporation to increase its capital stock, and to transfer a portion thereof as a bonus to a mortgagee to induce the making of the loan, cannot be questioned by creditors of the corporation whose claims antedated the giving of the mortgage.[2]

3. SAME—EQUITABLE SET-OFF.

> Creditors of a corporation whose debts accrued after an increase in its capital stock, and after the giving of a mortgage and the transfer of a portion of the increased stock to the mortgagee as a bonus, have no right to an equitable set-off against the mortgage for the amounts due upon their demands, where the mortgagee acted in good faith, and there is no evidence that the mortgage and the stock were worth more than the amount advanced.

4. MORTGAGES—PRIORITIES—PAYMENT OF PRIOR LIENS.

> A second mortgagee is entitled to a lien for money advanced to pay delinquent interest upon the prior mortgage in order to prevent foreclosure, superior to that of creditors under levies subsequent to the mortgage but prior to the payment.

5. SAME—RECEIVERS.

> A receiver of a corporation is entitled to a lien for taxes paid on the corporate realty, and interest paid upon a mort-

[1] Rehearing (application of defendants Hinsdill and Lidgerwood Manufacturing Company) denied November 17, 1896.

[2] With this case as reported in 38 L. R. A. 490, is a note collating the authorities on bonus stock of corporations.

gage thereon, superior to that of a second mortgagee or of execution creditors of the mortgagor.

6. SAME—RIGHTS OF INTERVENING CREDITORS.

    Execution creditors of a mortgagor are entitled to priority over the mortgagee as to moneys advanced by the latter subsequent to their levies.

7. VENDOR'S LIEN—WAIVER.

    A seller of chattels to be annexed to realty, by taking the written guaranty of a third party for the payment of the purchase price, waives his right to a vendor's lien.

Appeal from Kent; Grove, J. Submitted June 4, 1896. Decided July 28, 1896.

Bill by William F. Dummer against Charles O. Smedley, receiver of the Gypsum Plaster & Stucco Company, and others, to foreclose a mortgage. From the decree entered, complainant, defendant Smedley, as receiver, and defendants Nancy M. Hinsdill and William L. Tyler, appeal. Modified and affirmed.

*T. J. O'Brien* and *James H. Campbell,* for complainant.

*Benn M. Corwin* (*Taggart, Knappen & Denison,* of counsel), for defendant Smedley.

*Charles O. Smedley* (*Taggart, Knappen & Denison,* of counsel), for defendant Hinsdill.

*Maher & Salsbury,* for defendant Tyler.

*Charles B. Blair,* for defendant Lidgerwood Manufacturing Company.

LONG, C. J. This is an action to foreclose a mortgage made by the Gypsum Plaster & Stucco Company to the complainant on October 4, 1892, on 120 acres of land in the township of Wyoming, Kent county, with the gypsum mines and mills thereon, to secure payment of $25,-000, with interest. The mortgage was recorded October

5, 1892. A chattel mortgage covering the personal property about the mills was given as additional security.

It appears that, prior to 1891, the Union Mills Plaster Company, a corporation, had been engaged in business near Grand Rapids in the quarrying of plaster rock, and in the manufacture and sale of land and calcined plaster. The lands and quarries, with the mills, were sold by the company to Andrew L. Hubbell, and by him, December 23, 1891, conveyed to the Gypsum Plaster & Stucco Company, a corporation organized under the laws of Illinois, for the stated consideration of $165,500, and the company's notes were given for this amount. The stockholders of the new company were James B. Hubbell, Mr. Russell, and Mr. Carland. The two latter held one share each, and the balance of the stock was held by Mr. James B. Hubbell. The capital stock was $100,000. A note for this amount was given to Andrew L. Hubbell by the company as a part of the purchase price of the property, and was by him transferred to James B. Hubbell, and by the latter surrendered and canceled, and in this manner the capital stock was treated as fully paid. The Gypsum Plaster & Stucco Company also assumed certain of the debts of the Union Mills Plaster Company, among them being many debts still existing and involved in the present litigation, and also a mortgage to the Union Mutual Life Insurance Company, which amounted at the date of the transfer, for principal and interest, to $28,600. Thereafter the company carried on the business, and became more and more involved in financial difficulties. A foreclosure decree was taken upon the insurance company mortgage, and the day of sale was fixed for October 6, 1892. From time to time during that summer, levies of attachments and executions had been made upon the property, subject to the mortgage, when, about the 1st of October, these levies amounted in all to $14,000.

Mr. Frank L. Noble had been the active business manager of the corporation, and a portion of Mr. Hubbell's

stock had been transferred to him. Mr. Hubbell, Mr. Noble, and Mr. Russell were then the directors and stockholders. It was found necessary to raise money, not only to satisfy the insurance company's decree, but to compromise or adjust the attachment and execution levies, and provide a working capital for the company. Negotiations had been for some time carried on between the corporation and Mr. E. F. Uhl, of Grand Rapids; and before October 1st this had resulted in an agreement that Uhl would take from the corporation a mortgage of $35,000, and would loan it the sum of $30,000, the remainder being for his services in procuring the loan. Mr. Herbert R. Gill, of Ohio, was extensively interested in the plaster business, as a purchaser of such material. He examined the property, and considered the lands and quarries worth $100,000, and the improvements $18,000. In the expectation that he would ultimately be interested in the business, he had associated himself with Mr. Hubbell and Mr. Noble in active efforts to procure further capital. Together they had interested Mr. Dummer, the complainant here, who was the vice president of the Northwestern National Bank of Chicago. Together they had determined that $25,000 in addition to that realized on the Uhl mortgage would be necessary to carry on the business successfully. The mortgage in controversy was given to Mr. Dummer, but the moneys were not all paid in at that time, being paid from time to time, as will be stated hereafter. The Uhl mortgage was given on October 5th, the decree of the insurance company satisfied, and on the same day the mortgage in controversy was recorded. The moneys advanced by Mr. Dummer were paid over to Mr. Russell, who, with Mr. Noble and Mr. Gill, came to Grand Rapids, and entered upon the task of adjusting the liens upon the property.

It is claimed by the defendants that these gentlemen represented to the attachment and execution creditors that they had only a small amount of money available, and could not pay in full; and that these creditors, sup-

posing that the moneys came from the Uhl mortgage over and above the amount necessary to pay the insurance company decree, compromised their claims at about 50 cents on the dollar, taking renewal notes for the residue, upon the representations of these parties that the company would be able to go on and do a successful business and pay its debts; and that they thereupon discharged their levies. It is also claimed that at this time the creditors knew nothing of the existence of the Dummer mortgage, and did not discover it had been given until 33 days thereafter. Afterwards they began suits as the renewal notes matured, and the same attachment and execution liens were placed upon the property, together with many additional ones. The dates of the attachment and execution levies will hereafter be shown. In the meantime, Mr. John W. Dickinson, of Chicago, had become interested with Dummer and Gill, and the $25,000 represented by the Dummer mortgage was paid by the three, as follows: October 4, 1892, by Dummer, $8,500; October 17, 1892, by Dummer, $1,500; September 21, 1892, by Gill, $600; October 24, 1892, by Gill, $400; November 4, 1892, by Gill, $2,100; November 7, 1892, by Gill, $1,500; November 29, 1892, by Gill, $2,000; December 7, 1892, by Gill, $400; January 10, 1893, by Gill, $2,000; January 13, 1893, by Gill, $1,000; January 23, 1893, by Dickinson, $2,000; February 6, 1893, by Dickinson, $500; February 11, 1893, by Dickinson, $500; February 24, 1893, by Dickinson, $500; March 10, 1893, by Dickinson, $500; March 25,1893, by Dickinson, $1,000.

At the time of the execution of the mortgage in controversy, a series of notes was executed, due in from 30 days to 18 months, and were all payable to Mr. Dummer. After the moneys were all paid in, the corporation took up these notes, and issued a new series of notes, dated back as of the date of the mortgage, and running from 1 to 5 years, viz.: Five notes, of $2,000 each, to Mr. Dummer; five notes, of $2,000 each, to Mr. Gill; five notes, of $1,000 each, to Mr. Dickinson. The complainant claims that

these notes were given in place of the old ones, and were secured by the $25,000 mortgage. It is claimed by the defendants that in June, 1893, Dummer, Gill, and Dickinson agreed to surrender $10,000 of their holdings under this mortgage, or two-fifths of the holdings of each, in order that the company might raise money elsewhere, and agreed to accept for their security a third mortgage for $10,000, running to John W. Dickinson, and which mortgage was executed; that, to accomplish this, the second series of notes was surrendered by Dummer, Gill, and Dickinson, and new notes taken, thus leaving their interest in the mortgage only $15,000, the remaining $10,000 being released for the benefit of the company, and being represented by five notes of $2,000 each. The complainant claims that, while these notes and the mortgage to Dickinson were executed, the arrangement was never completed, and that the mortgage in controversy stood as security for the payment of the second series of notes.

It appears that in November, 1892, the capital stock of the corporation had been increased from $100,000 to $500,000. Of this increase, $100,000 was made preferred stock, and was to be used for the purpose of paying creditors as far as they could be induced to accept the same. Of the remaining $300,000 of stock, it had been agreed that Dummer and Gill should have $2.50 for each $1 of money paid in by them, thus giving Dummer and Gill each $25,000 of the stock; and, when Dickinson entered into the arrangement, he was given a similar issue of stock, amounting to $12,500.

In 1893, litigation was commenced by some of the execution creditors to set aside the Dummer mortgage, as fraudulent as against them. Mr. Dummer appeared and answered. This litigation is still pending, and, by consent of the parties, has been transferred to the present suit. The business of the corporation was continued until January 1, 1894, when the company entered into a pool with other manufacturing companies. The mill was

thereafter operated only at intervals, to produce its quota of material, and but little money was realized by the corporation.

On July 6, 1894, this bill was filed. Defendants Hinsdill and Tyler answered. The bill was taken as confessed against the Gypsum Plaster & Stucco Company. In December, 1894, Mr. Smedley was appointed receiver, and was thereupon granted leave to intervene and answer. He filed an answer, setting up that the mortgage was invalid, and averring that the general creditors of the Gypsum Plaster & Stucco Company had rights in the properties prior to the Dummer mortgage. After some proofs were taken, the Lidgerwood Manufacturing Company, a New York corporation, also obtained leave to intervene as a defendant, and, by way of a basis for affirmative relief, alleged that in March, 1893, it sold to the Gypsum Plaster & Stucco Company a cable apparatus for hoisting rock out of the quarry, for the price of $4,000, of which $3,500 remained unpaid; that this property had become an essential part of the plant, and was procured by the company by fraud; and that, though the intervener was entitled to retake the property, it had so become a part of the plant that equity and the interests of all the parties required it should remain there, and the intervener should have a lien for the amount unpaid. The answers of the defendants Hinsdill, Smedley, and Tyler also set up facts as a basis of affirmative relief, in the nature of a cross-bill, and they ask that the complainant's mortgage be vacated.

It appeared upon the hearing that the complainant had advanced $1,050 for the payment of delinquent interest upon the Uhl mortgage, in order to prevent foreclosure; that the receiver had paid taxes upon the company property, and also delinquent interest upon the Uhl mortgage, to the amount of $1,365. The proofs were taken in open court and by deposition, and on September 20, 1895, a decree of foreclosure was entered, and awarded priority to the several parties as follows:

1. To the complainant, $1,050 and interest, for moneys advanced to pay delinquent interest on the Uhl mortgage.

2. To Receiver Smedley, $1,365 and interest, being the amount paid by him for taxes, and delinquent interest on the Uhl mortgage.

3. To the Lidgerwood Manufacturing Company, $4,080, being the entire amount of its unpaid debt and interest.

4. To complainant, Dummer, the sum of $10,000 and interest, for advances made by him under the mortgage.

5. To H. R. Gill, $4,100 and interest, for moneys advanced by him under the mortgage prior to November 7, 1892, that being the date when defendant Hinsdill levied the first attachment after the giving of the Dummer mortgage.

6. To defendant Hinsdill, $4,408, with interest, being the amount of her debt under the levy of November 7, 1892.

7. To H. R. Gill, $4,561, for moneys advanced by him on the Dummer mortgage after the Hinsdill levy, and before the next levy.

8. To E. D. Preston and D. H. Armstrong, $4,000 and interest, they being the next levying creditors, and that being the full amount of their claim.

9. To H. R. Gill, $1,161, being for moneys advanced on the Dummer mortgage after the foregoing named levies, and before the next levy.

10. To E. D. Preston, $177, he being the next levying creditor.

11. To H. R. Gill and John W. Dickinson, $4,600, being the remainder to Gill for his advances, and to Dickinson for advances made by him before the next levy.

12. To C. O. Smedley, $365, he being the next levying creditor.

13. To John W. Dickinson, $2,300, being the remainder of his advances upon the mortgage.

From this decree, defendant Smedley, as receiver, and the defendants Hinsdill and Tyler, appeal. The other defendants do not appeal. The complainant also appeals from the decree.

The receiver contends that the mortgage is fraudulent and void as against the general creditors, and that the lien under it should be postponed to the payment of their claims. This claim is based upon two grounds: (1) That

the mortgage was given for a greater amount than was paid at its execution, and, if any future advances were to be made, such fact was not set forth in the mortgage; (2) that the beneficiaries under the mortgage were stockholders in the corporation, they having received a large number of shares of the bonus stock.

It appears from the record that the corporation had ample power to borrow money, and give security on the corporate property therefor. The statute of Illinois, under which this corporation was organized, gives it this power. From a careful reading of the record, it appears to us that no other conclusion can be reached than that, before the time the mortgage was given, an arrangement was made by the corporate authorities to make a loan of that amount. They regarded the condition of the company as serious, and that by the placing of the Uhl mortgage, and thus discharging the insurance company decree, the company would not be in a condition to go on with the business without further means. Mr. Gill had been working to make the loan. Dummer was seen, and was offered some of the bonus stock if he would take part of the mortgage. While the arrangement was not fully completed, Mr. Dummer says that Gill agreed to put in $10,000 if the company would arrange for the other $5,000, as he (Dummer) was to put in $10,000. Matters were in this condition when the mortgage was executed. Dickinson thereafter consented to put in the other $5,000. From all that took place during the few days prior to the execution of the mortgage, and the conduct of the parties afterwards, it is apparent that it was the intent of all the parties that the full sum of $25,000 should be paid in. As soon as Gill could raise his money he was to pay it over. Dummer put in $8,500 at first, and within a few days thereafter paid over the balance of $1,500, completing his share. Gill and Dickinson subsequently paid the full amount they were to take. There is no showing upon the record that there was any bad faith in the giving of the mortgage, and the consideration was fully

paid. The mortgage was therefore a valid lien upon the property, at least as between the corporation and the mortgagees.

The fact that the mortgage did not state that it was given t o secure future advances would not render it void as to creditors. *Brace* v. *Berdan,* 104 Mich. 356. A mortgage is no t fraudulent for including contemplated advances. *Newkirk* v. *Newkirk,* 56 Mich. 525. Counsel for the receiver cite *Showman* v. *Lee,* 86 Mich. 560, in support of their contention; but all that was held in that case was that, if the mortgage was taken for a greater amount than was actually paid, the parties must act in good faith; that parties who take security from insolvents, or from parties who are indebted to others, must act in good faith, and so as not unnecessarily to hinder, delay, or deceive other creditors; that the taking of a mortgage for an amount in excess of the debt or the assumed liability is a badge of fraud, and it is a fraud in law if the purpose is to protect the debtor's interest from other creditors. This is but the statement of a familiar principle of law. In the present case, however, no such showing is made. The parties were acting in good faith, and the whole of the consideration thereafter paid. The m ere fact that the mortgage was given for a greater amount would not necessarily make the mortgage fraudulent. There must be some fact or circumstance showing an intent to hinder, delay, or defraud creditors, and this is necessarily a question of fact. This record, as we have said, discloses no such fact.

The contention that the beneficiaries under the mortgage stood as stockholders, and not as mortgagee creditors, has no force. It is claimed by counsel for the receiver that the record discloses that these beneficiaries intended to become interested as stockholders, and that the mortgage was a plan adopted to save them against the risk of loss on their investment, while they obtained all possible chances of gain. Counsel treat the question as though the stock given to the mortgagees were part

of the original capital stock.  This is not the fact.  The original capital stock was $100,000, and was treated as fully paid.  The corporation received all the properties for that amount and the payment of some old debts, and in this suit the original stock must be treated as fully paid up.  In November, 1892, the stock was increased from $100,000 to $500,000.  The mortgagees took the mortgage with the understanding that this should be done, and they be assigned certain shares of this common stock, the first $100,000 being held as preferred stock.  At that time the company was greatly embarrassed, and, as is claimed, found it difficult to raise money on a second mortgage. The mortgage had been given to Uhl for $35,000.  There were certain attachment and execution levies against the property to be taken care of, and the proposition was made to Dummer and Gill that a portion of this "bonus stock," as it is called, should be given to them if they would advance this $25,000 on the mortgage.

In *Handley* v. *Stutz*, 139 U. S. 417, this subject was fully discussed.  The bill was filed by Stutz and others, creditors of the Clifton Coal Company, to compel an assessment upon certain shares of stock for the satisfaction of the debts of the company.  The company was organized in 1883, and the capital stock of $120,000 all subscribed and paid for.  In May, 1886, the stock was increased to $200,000.  The increased stock was issued to Handley and the other defendant under the following circumstances: After unsuccessful attempts to sell $50,000 of its bonds secured by mortgage, the company offered $1,000 stock as a bonus with each $1,000 bond.  The defendants bought the bonds and took the bonus stock. The debts of the complainants were created before the increase of the stock.  Speaking of this bonus stock, the court said:

"The case, then, resolves itself into the question whether an active corporation, or, as it is called in some cases, 'a going concern,' finding its original capital impaired by loss or misfortune, may not, for the pur-

pose of recuperating itself and providing new conditions
for the successful prosecution of its business, issue new
stock, put it upon the market, and sell it for the best
price that can be obtained.  *   *   *   To say that a cor-
poration may not, under the circumstances above indi-
cated, put its stock upon the market, and sell it to
the highest bidder, is practically to declare that a corpo-
ration can never increase its capital by sale of shares if
the original stock has fallen below par.  *   *   *   It
frequently happens that corporations find it necessary to
increase their capital in order to raise money to prosecute
their business successfully, and one of the most frequent
methods resorted to is that of issuing new shares of stock,
and putting them upon the market for the best price that
can be obtained.  *   *   *   It would seem to follow that,
if the stock had been of some value, that value, however
much less than par, would have been the limit of the
stockholders' liability."

Speaking further in the case as to the rights of cred-
itors, and what particular creditors would be affected by
the increase of the capital stock, it was said:

"We have no doubt that the learned circuit judge held
correctly that it was only subsequent creditors who were
entitled to enforce their claims against these stockholders,
since it is only they who could by any legal presumption
have trusted the company upon the faith of the increased
stock."

In *Richardson's Ex'r* v. *Green*, 133 U. S. 30, it appeared
that Richardson had advanced moneys on bonds, and
taken stock as bonuses.  On a suit to foreclose the mort-
gage, the moneys actually advanced by him were
allowed, without any reduction on account of the bonus
stock, though there were general creditors subsequent to
the mortgage securing his bonds.

It is therefore apparent from these cases, which we
think embody the settled law on the subject, that the de-
fendants Hinsdill and Tyler are not in position to ques-
tion the right of the corporation to increase its capital
stock, and to sell or pledge such bonus stock to raise
money for the legitimate purposes of the corporation.
Their debts antedated the giving of the mortgage.

As to creditors whose debts have since arisen, the receiver contends that, in equity, they have the right to an equitable set-off against the mortgage for the amounts due upon their demands. In the first place, it may be said that that question was not raised by the answer of the receiver, and for that reason cannot now be considered; and, second, we know of no rule of equity that would allow such set-off against the mortgage under the circumstances here stated. The mortgagees were acting in good faith; had paid in full for the mortgage, upon the understanding that this bonus stock should be assigned to them. The company had a right to issue the stock, and sell it for the best obtainable price. It realized $25,000 cash for the mortgage and stock. There is no showing here that the mortgage and stock were worth a dollar more than the $25,000.

We think the complainant was entitled to his decree of foreclosure for the full amount of the mortgage, and that he had such right under the second series of notes, as the third was never used, and the first was delivered up and cancelled. We are also of the opinion that the court was not in error in giving the complainant the prior lien for interest paid on the Uhl mortgage. It was necessary to protect his own mortgage lien. Neither do we think the court was in error in providing, second, that the receiver should have a lien for the moneys paid by him for interest on the Uhl mortgage and the taxes on the property. It would be inequitable to hold that the receiver, having protected the property from sale for the taxes assessed and interest on the Uhl mortgage, and preserved the security for the mortgagees, should not now be protected.

We now come to the discussion of the priorities fixed by the court in other portions of the decree. The Lidgerwood claim is made a lien prior to the complainant's, except as to the moneys advanced as interest upon the Uhl mortgage. We think this claim cannot be sustained by the Lidgerwood Company. A court of equity will not create a lien upon real estate in favor of a party

unless, from the nature of the transaction, rights have sprung up which ought to be held binding upon the specific property. *Kelly* v. *Kelly*, 54 Mich. 30. In the present case there is nothing in the record showing that the company ever intended to claim a lien upon the corporate property of the Gypsum Plaster & Stucco Company. On the other hand, the Lidgerwood Company was informed by Gill, before the machinery was sold, that the Gypsum Company was in a bad condition financially. The order was made by the Gypsum Company for the machinery on January 17, 1893. The matter ran along until February 2d, when Mr. Gill gave his personal guaranty for the payment of the machinery. During the summer of that year, the Lidgerwood Company was pressing Gill for payment upon his guaranty. Gill thereupon took a bill of sale of the engine and cable to himself. We are satisfied from the evidence that no false representations were made by the officers of the corporation to the Lidgerwood Company, or by Gill, of the financial condition of the corporation. The Lidgerwood Company was advised by Gill, in advance of the sale, that "Bradstreet and Dun give very unfavorable reports of the concern, and well they might." Acting upon this report, the company sold upon the written guaranty of Gill. The rule is well settled that a vendor's lien is waived by taking the obligation of a third party. 2 Washb. Real Prop. 94–96 (*507). This rule has been fully sustained by this court. *Sears* v. *Smith*, 2 Mich. 243; *Wisconsin, etc., Bank* v. *Filer*, 83 Mich. 496. The Lidgerwood claim cannot therefore be sustained, but that company must be held to have waived it, and, having waived it, the lien is lost. *Au Sable River Boom Co.* v. *Sanborn*, 36 Mich. 358.

We think the court was not in error in fixing the priorities between the other claimants. By the decree, the court gave the execution and attaching creditors priorities over the moneys which were paid under the mortgage subsequent to the levies.

The decree of the court below will be modified in respect to the Lidgerwood claim, and affirmed as to the other portions. The complainant will recover his costs against the Lidgerwood Manufacturing Company. No other costs will be allowed.

The other Justices concurred.