## In re LOCUST BLDG. CO., Inc.

## Appeal of AMERICAN TRUST CO.

(Circuit Court of Appeals, Second Circuit. April 7, 1924.)

No. 14.

1. **Bankruptcy ⬦⇒440—Order adjudging mortgage void reviewable by appeal.**

An order adjudging a mortgage held by a creditor void as against the trustee is reviewable by appeal.

2. **Fraudulent conveyances ⬦⇒15—Conveyance through dummy not a badge of fraud.**

That real estate transactions are conducted through a dummy is not a badge of fraud, which puts a bank purchasing a mortgage executed to the dummy on inquiry as to the good faith of the transaction, though it knows that mortgagee is not acting for himself, but for an undisclosed principal.

3. **Notice ⬦⇒6—Failure to make inquiry, unless willful or fraudulent, will not impute notice.**

To impute notice of facts which one might have learned by inquiry, there must have been a fraudulent turning away from a knowledge of facts, which the res gestæ would suggest to a prudent mind, and a mere want of caution is not sufficient.

4. **Fraudulent conveyances ⬦⇒283—Want of bona fides of purchaser an affirmative defense.**

Want of bona fides of the purchaser of mortgages *held* an affirmative defense, the burden of which vested on defendant.

5. **Evidence ⬦⇒94—Burden of proof on issue never shifts.**

The burden of proof never shifts from the party having the affirmative of an issue, though during the progress of the proceeding the burden of going forward with the evidence to rebut a prima facie case may shift.

6. **Bankruptcy ⬦⇒101—Filing of petition is caveat only to those who may thereafter acquire interest in property.**

The statement that the filing of a petition in bankruptcy is "a caveat to all the world" applies only to parties who have no substantial claim of a title to property of the bankrupt, or of a lien thereon, when the petition is filed.

7. **Bankruptcy ⬦⇒101—Filing of petition cannot affect rights of subsequent purchaser of prior mortgage.**

The filing of a petition in bankruptcy against a mortgagor did not affect the rights of a subsequent purchaser of mortgages executed and recorded more than a year prior to the bankruptcy.

8. **Courts ⬦⇒371(3)—Federal courts are governed by local law.**

Whether a conveyance will be held fraudulent as to creditors by the federal courts will be determined by the local law.

9. **Fraudulent conveyances ⬦⇒57(1), 162(1)—Insolvency alone does not avoid conveyance; must have been common fraudulent intent.**

That a grantor is insolvent at the time of the transfer is not of itself a ground for setting it aside; but there must have been a fraudulent intent common to both seller and purchaser.

10. **Fraudulent conveyances ⬦⇒57(1)—Conveyance by insolvent fraudulent as to existing creditors, unless for valuable consideration.**

Insolvency of the grantor at the time of his conveyance renders it fraudulent as to existing creditors, if not based on a valuable consideration.

---

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**11. Mortgages ⬤⇒257—Purchaser without notice from purchaser with notice is protected as bona fide purchaser.**

A second purchaser of a mortgage for value without notice of defenses, from a first purchaser who is charged with notice, is a bona fide purchaser and entitled to protection.

**12. Fraudulent conveyances ⬤⇒155, 159(1)—Fraudulent intent of grantor will not invalidate conveyance, unless grantee had actual or constructive notice of such intent; grantee with notice not protected.**

A conveyance for a valuable and adequate consideration cannot be invalidated by creditors, even if the grantor had a fraudulent intent, if the grantee had no actual notice of such intent and no notice of facts calculated to put him on inquiry, which would have led him to a discovery of the intent; but, if he had notice of such intent at the time, the payment of an adequate consideration will not validate it.

**13. Fraudulent conveyances ⬤⇒165, 196—Bona fide purchaser before creditors have moved is protected.**

A bona fide purchaser for value is protected, whether he purchases from a fraudulent grantor or fraudulent grantee, if he acquires title before creditors have taken any steps to subject the property or set aside the fraudulent conveyance.

**14. Fraud ⬤⇒58(1)—Clear and convincing proof required to establish charge of fraud.**

A stricter standard of proof than is necessary in ordinary civil cases is required to establish a charge of fraud, commonly stated as "clear and convincing proof."

**15. Attorney and client ⬤⇒104—Notice to attorney not imputed to client, where acquired in serving another client.**

The rule that notice to an attorney is imputed to his client is not applicable, where the knowledge of the attorney was acquired while acting for a different client and could not be communicated to another without a breach of professional duty.

**16. Fraudulent conveyances ⬤⇒81—Assignment to secure future advances valid.**

An assignment of a mortgage to a bank to secure future advances to be made to the mortgagee is valid to the extent of the advances so made, as against creditors of the mortgagor, and its validity is not impaired by the fact that it does not show on its face the real character of the transaction.

Petition to Revise and Appeal from the District Court of the United States for the Eastern District of New York.

In the Matter of the Locust Building Company, Inc., bankrupt. The American Trust Company appeals from an order of the District Court, and also petitions to revise such order. Petition to revise dismissed, and order reversed on appeal.

See, also, 272 Fed. 988. Certiorari denied, 265 U. S. ——, 44 Sup. Ct. 635, 68 L. Ed. ——.

Henry M. Bellinger, of New York City (Morgan J. O'Brien, of New York City, of counsel), for petitioner and appellant.

Samuel Silbiger, of Brooklyn, N. Y., for trustee and respondent.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This matter comes into this court on a petition to revise an order made in a bankruptcy proceeding and upon an appeal from the said order. The order in question was made on January 10, 1923. The petition to revise and the appeal both appear to have been taken in time, and on April 28, 1923, an order was

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

entered which provided that the petition to revise and the petition for leave to appeal "be and hereby are combined into one appeal, for the purposes of the appeal herein." The undoubted intention of the parties was not to combine the petition to revise and the appeal into one appeal, but was to consolidate the petition to revise and the appeal into one proceeding, which could be heard upon one record. We shall so treat it, notwithstanding the failure to express that intention in more appropriate language.

[1] The order involved, which, as stated, is that of January 10, 1923, adjudged and decreed that a certain mortgage for $4,500, dated March 14, 1917, was a valid mortgage to the extent of the balance of the principal sum of $2,500, and the trustee of the bankrupt was directed to pay that sum and the accrued interest. The order also adjudged that two certain other mortgages, one dated on March 14, 1917, and the other dated on July 26, 1917, were void as against the trustee and creditors of the bankrupt. This is plainly an appeal "from a judgment allowing or rejecting a debt or claim of $500 or over." The case being so plainly an appeal, we are unable to see why a petition to revise should ever have been brought, and it is hereby dismissed, and the case will be disposed of on the appeal.

This brings us to a consideration of the facts which are involved in the appeal. This appeal is brought here by the American Trust Company, a New York corporation, as the owner of three certain mortgages upon which it claims there remains due and payable in the aggregate $10,833 and accrued interest, affecting premises which have been decreed to be the property of the bankrupt and were conveyed to the trustee for the creditors pursuant to an order made in the District Court of the United States for the Eastern District of New York, dated March 21, 1921.

Prior to this transfer of the properties to the trustee, the American Trust Company had commenced an action in the proper court of the state of New York to foreclose one of the three mortgages above referred to, and the trustee of the bankrupt, pursuant to an order of the court, was brought in as a party defendant in that suit. Thereafter, and on February 21, 1921, the trustee of the bankrupt obtained an order from the United States District Court for the Eastern District of New York which permitted him to sell the property of the bankrupt, including the three mortgages already referred to, free and clear of all liens and demands, and directing him to hold the proceeds arising from the sale, subject to the final order of the court, or the judgment of a court of competent jurisdiction as to the validity, bona fides, and extent of the said mortgages, liens and claims. This order of February 21, 1921, also stayed the American Trust Company until the further order of the court from proceeding further with its foreclosure suit to which we have above referred.

Thereafter upon the application of the American Trust Company the United States District Court made an order referring to a special commissioner the question as to the validity of the mortgages, the amount of the advances made on account of them, and the order of priority affecting the premises covered by them. On September 21,

1922, the commissioner reported. He found that the mortgage dated March 4, 1917, was a valid mortgage, and that the balance due thereon was $2,500, with interest, less the sum of $267.91, which had been paid on interest account; he also found that the two other mortgages were void as to the trustee and the creditors of the bankrupt; and this report the District Court, over the objection of the American Trust Company, ratified and confirmed by an order made January 10, 1923.

It appears that a petition in bankruptcy was filed on August 5, 1918, against the Locust Building Company, Inc., and it was adjudged a bankrupt on September 3, 1918, and on October 8, 1918, Frederick Kiegley was elected trustee of the bankrupt's estate. It will be hereinafter referred to as the bankrupt. One Samuel Epstein was the president and virtually the sole stockholder of the bankrupt. He was also the president and sole party in interest of the Beta Building Company, Inc., and of the Saga Building Company, Inc., in which names title to the property of the bankrupt was taken. These two corporations will be hereinafter respectively referred to as the Beta Company and the Saga Company. These two corporations were caused to be organized by Epstein. All three of these corporations were in reality other names for Epstein, he being the sole party in interest in each of them.

It also appears that three mortgages were given by the Saga Company. The first was made and executed on March 14, 1917, in the sum of $4,500. The second was also dated on March 14, 1917, and was in the sum of $5,000. The third was dated on July 26, 1917, and was in the sum of $10,000. The first of these mortgages was made to the Queens County Trust Company. The other two were made to one Rose Bernstein. The second and third mortgages were assigned by her to the Queens County Trust Company by written assignments; the second being assigned on May 10, 1917, and the third on July 26, 1917, the first assignment being recorded on May 16, 1917, and the other on August 6, 1917. The Queens County Trust Company assigned in writing the second and third mortgages to the American Trust Company; both of these assignments being dated September 21, 1920. The Queens County Trust Company is hereinafter referred to as the Trust Company.

The Locust Building Company, the bankrupt herein, was the owner of certain premises in the city of New York on which it built ten brick multi-family houses. In so doing it incurred a debt of $30,000, which remained unpaid. It then transferred the title to seven of these houses for certain lots, and the title to the lots was taken in the name of the Beta Company. Epstein, the president of the Beta Company and sole party in interest therein, in an attempt to cover up the facts, had testified that the latter company paid the Locust Company $10,000 for the lots. This testimony was made the basis of an indictment for perjury, upon which he was convicted, and his conviction was affirmed by this court. 271 Fed. 282.

The Beta Company in turn commenced the erection of nine multi-family houses on the lots thus acquired, and in doing so incurred debts exceeding $20,000. On both of these building operations secured loans

were made by the Trust Company, in which the bank accounts of the Locust Company and Beta Company were kept. While the Beta building operation was in progress the Trust Company was apprised of the financial difficulties of the bankrupt and Beta Company, and received a statement setting forth the amount due the creditors of the Locust Company and the Beta Company and the estimated cost of the completion of this second operation, and thereupon the bank stepped in and acquired all of the stock of the Beta Company, and secured from the creditors of the Beta Company releases of any liens they had filed, and an agreement to postpone collection of their accounts until the completion of the operation, and the buildings were thereafter completed under the supervision of the bank.

In the interim the Locust Company contracted to exchange two of the first ten houses it had erected for two pieces of land owned by Henry Buser and Adam Pfundstein. After the making of the contract of exchange and prior to the closing of title, the two houses were by mesne conveyances and without consideration transferred, until title thereto of record appeared in the name of Rosa Bernstein, a sister-in-law of Epstein. The Trust Company held second mortgages aggregating $4,000 on these two houses, and agreed with Epstein to cancel said $4,000 second mortgages and accept in lieu thereof a first mortgage of $4,500 on the land being acquired. The closing of the title was adjourned several times, but the titles were finally exchanged and at the same time the bank's $4,000 mortgages were canceled. Rosa Bernstein executed the deeds conveying the houses to Buser and Pfundstein, and these two gentlemen and their wives conveyed their property to the Saga Company. At the same time the Saga Company executed a mortgage of $4,500 to the Trust Company, the validity of which mortgage has not been disputed by the trustee. Simultaneously the Saga Company executed a $5,000 bond to Rosa Bernstein, secured by a second mortgage covering the lots.

The bond and mortgage for $5,000 were on May 10, 1917, assigned by Rosa Bernstein to the Trust Company. On July 26, 1917, the Saga Company executed a bond to Rosa Bernstein in the sum of $10,000, secured by a third mortgage on the same lots, and simultaneously the bond and mortgage for $10,000 were assigned by Rosa Bernstein to the Trust Company. After the assignment of the bond and mortgage to the Trust Company, the latter advanced to Rosa Bernstein various sums of money aggregating $8,333.92, taking her promissory notes therefor.

All of the above mortgages were on September 21, 1920, assigned by the Trust Company to its successor, the American Trust Company, the present holder. It is stipulated by all parties in interest that the first mortgage mentioned above was valid, but the trustee of the bankrupt's estate denies the validity of the second and third mortgages, claiming that they were without consideration and fraudulent as against the creditors, and that the Trust Company was not a bona fide purchaser for value without notice. The trustee pursuant to an order of the District Court has sold the premises covered by the mortgages free and clear of all liens, and now holds the proceeds pending the determination of the validity of these mortgage liens.

The American Trust Company caused a proceeding to be instituted in the District Court, in which it alleged that it is the owner of the three mortgages above mentioned, and it asked that the question of the bona fides of the mortgage-liens and the extent thereof might be referred to a master to hear and determine the same. An order to that effect was entered, a hearing took place, and the master reported his findings to the District Court which confirmed them. The master in his report states the questions as submitted to him as follows:

"The trustee asserts that upon the facts stipulated and the evidence adduced here the questions to be decided are: (1) Whether mortgages given without consideration to a dummy for the bankrupt prior to the bankruptcy, but while insolvent, become validated by an assignment of the mortgages, where the assignee has knowledge of the fraudulent character of the transactions, or of facts sufficient to put the assignee upon its inquiry; and (2) whether the assignee of an invalid mortgage, knowing the same to be invalid, can subsequently validate the same by making advances upon notes to a dummy for the mortgagors. The attorney for the American Trust Company, on the other hand, contends that as a matter of law a mortgage can be given to secure future advances or subsequent advances, and that such advances, when or if made, become a part of the mortgage debt secured by the lien of the mortgage, and that the mortgage need not show upon its face that it is intended to secure such future advances."

The conclusion which the master reached he states as follows:

"It is my opinion, founded upon the evidence adduced in this matter, that the Queens County Trust Company had actual knowledge of the insolvency of this bankrupt at the time of the transfer of the real estate in question to Saga Building Company, Inc., and at the time of the execution of the bonds and mortgages in question here to Rosa Bernstein, and that the bank had actual knowledge that the transactions were dummy transactions and made without consideration, and would therefore be void as to the creditors and trustee of this bankrupt. The transfer of the property was consummated in the office of the then attorneys for the Queens County Trust Company, who had notice of objections to the title made upon the closing thereof, and who in fact themselves obtained adjournments of the closing of the title until the objections thereto were overcome to their satisfaction, and accordingly to the satisfaction of the Trust Company. It is well settled that knowledge of the attorney is imputed to the client or principal. Anderson v. Blood, 152 N. Y. 285, 46 N. E. 493, 57 Am. St. Rep. 515; Hyde v. Bloomingdale, 23 Misc. Rep. 728, 51 N. Y. Supp. 1025. The contention of the American Trust Company that one may take a mortgage or other security upon the property of a failing debtor, provided that the same was taken for a full and present valuable consideration and without fraud, is well taken; but the difficulty here is that it has not been proven that there was present full and valuable consideration passed at the time of the execution and delivery of these mortgages, nor of the assignments thereof, nor has the absence of fraud been shown, and this court has heretofore decided in this case that there was no valid consideration for the transfer of the real estate by the bankrupt to Saga Building Company, Inc., and that such transfer was in fact fraudulent and void against this trustee.

"The evidence in this bankruptcy proceeding clearly indicates that the Queens County Trust Company had knowledge of Epstein's financial transactions long prior to the fraudulent transfer of the property of this bankrupt to Saga Building Company, Inc., and long prior to the delivery of the two mortgages in question here. It is difficult to conceive how this claimant can now successfully maintain a position that the Queens County Trust Company was an innocent purchaser for value, when the information which it had was sufficient to put it upon its inquiry. Epstein testified that the moneys advanced by Queens County Trust Company and paid over to him on the notes of the dummy, Rosa Bernstein, were used in the erection of the build-

ings on the premises covered by these mortgages. Concerning the making of these advances, however, it appears from the account of Saga, Company, Inc., with the Queens County Trust Company, in evidence here, that the only moneys ever deposited in the bank as proceeds of these advances to her, were $1.500 advanced May 15, 1917, and deposited May 16, 1917, $300 deposited November 16, 1917, and $200 deposited on April 20, 1918—in all, $2,000. The proceeds of none of the other advances which the bank alleges to have been made to her ever reached the account of Saga Building Company, Inc., in the bank, nor were the proceeds of any of these notes delivered to Rosa Bernstein at the time of the assignments of these two mortgages. Between April 2, 1917, the date of the opening of the account to April 7, 1918, the Queens County Trust Company apparently advanced to Rosa Bernstein, through Epstein. about $8,333, and 28 different deposits appear where checks were given to Epstein. but drawn to the order of Rosa Bernstein, in different amounts, were deposited, but to whose account does not appear."

The District Judge, in confirming the report of the master, did not review the report, but contented himself with the statement that he "was fully justified in the conclusion reached." We are unable to concur in that conclusion for reasons which will appear as we proceed.

It is stipulated: That the first mortgage is valid; that at the time the Saga Company executed the mortgages involved it was the record owner of the premises; that Rosa Bernstein was a dummy for the Saga Company, and that she paid no consideration to that company for the mortgages executed to her, and that she afterwards assigned the same to the Trust Company; that she made and delivered to the Trust Company certain notes, aggregating $8,333.25, and that no part of these notes have been repaid to the American Trust Company, successor in interest to the Trust Company; that the amounts represented by these notes were actually paid by the Trust Company by its check drawn to her order, and that each and every one was indorsed by her and turned over to the Saga Company; the testimony shows that the proceeds of these notes were used by the Saga Company in making improvements on the property; that Samuel Epstein was the president of the Locust, Beta and Saga Companies.

[2, 3] We have not overlooked the conceded fact that Rosa Bernstein was in these transactions a dummy for the Saga. That she was so used does not constitute prima facie evidence of fraud assuming that the Trust Company knew that she was so acting. In perfectly legitimate real estate transactions it is not uncommon to make use of a dummy. We cannot say that it is a badge of fraud, and puts a party so negotiating upon inquiry, if he suspects that the party with whom he deals is not acting for himself, but is a dummy and acting for an undisclosed principal. To impute constructive notice of facts, which one might have learned if he had made inquiry, there must have been, as Vice Chancellor Wigram said in Jones v. Smith, 1 Hare, 55, a "fraudulent turning away from a knowledge of facts which the res gestæ would suggest to a prudent mind." If there has been a mere want of caution, "as distinguished from fraudulent and willful blindness," "then the doctrine of constructive notice will not apply; the purchaser will, in equity, be considered, as in fact he is, a bona fide purchaser without notice."

[4] The defense of bona fide purchaser is sometimes an affirmative defense, the burden of which the defendant assumes. Curtis, Collins

& Holbrook Co. v. United States, 262 U. S. 215, 224, 43 Sup. Ct. 570, 67 L. Ed. 956. In the case now before the court the master was evidently under the impression that it was the duty of the American Trust Company to show affirmatively the absence of fraud. We do not concur in that view of this case.

[5] The burden of proof never shifts from the party having the affirmative of the issue. But while the burden of proof does not shift, yet during the progress of the proceeding the burden of going forward with the evidence to rebut a prima facie case may shift. All this we pointed out in Cowen Co. v. Houck Mfg. Co., 249 Fed. 285, 161 C. C. A. 293. In the proceeding by the trustee for permission to sell the property covered by the mortgages free and clear of all liens, the burden of proof and the burden of evidence also was on the trustee in the first instance to establish the invalidity of the mortgages. The burden of proof continued with the trustee throughout, and the burden of evidence until at least he made out a prima facie case. United States v. Iron Silver Mining Co., 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571; Moffat v. United States, 112 U. S. 24, 5 Sup. Ct. 10, 28 L. Ed. 623. But we are quite unable to see, upon the evidence in this record, that a prima facie case was made out against the Trust Company, and in this case, in our opinion, the burden of evidence, like the burden of proof, remained upon the trustee throughout.

[6] It is claimed that the property covered by the mortgages herein involved was the property of the bankrupt's estate and was transferred in fraud of the creditors. The filing of a creditor's petition praying for an adjudication in bankruptcy is no doubt a caveat to all the world. It had, as the court declared in Bank v. Sherman, 101 U. S. 403, 406, 25 L. Ed. 866, the effect of an attachment and injunction. The bankrupt thereby became for many purposes civiliter mortuus. Those who dealt with its property between the filing of the petition and the final adjudication did so at their peril. And see Mueller v. Nugent, 184 U. S. 1, 14, 22 Sup. Ct. 269, 46 L. Ed. 405. That doctrine is not questioned in this case. But it has no application to the facts herein involved. The statement that the filing of the petition is "a caveat to all the world" applies only to parties who have no substantial claim of a title to the property of the bankrupt, or of a lien thereon when the petition in bankruptcy is filed. As to them the filing of the petition is neither a caveat nor an attachment, and creates no lien, and they are unaffected by it at least until the bankruptcy court takes actual possession of the property or in some way makes the claimants parties to the proceeding. Jaquith v. Rowley, 188 U. S. 620, 625, 23 Sup. Ct. 369, 47 L. Ed. 620; Hiscock v. Varick of New York, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; In re Rathman, 183 Fed. 913, 925, 106 C. C. A. 253.

[7] The bankruptcy petition was filed on August 5, 1918, and the adjudication followed on September 3, 1918, and the trustee's title related back to August 5, 1918. Prior to that time, not only the title to the premises covered by these mortgages had been already transferred to the Saga Company and the transfer recorded, but the Saga Company's second and third mortgages to Rosa Bernstein had been given

and recorded, and their assignment by her to the Trust Company also had been executed and recorded. Conceding that the filing of the petition in bankruptcy against the Locust Company on August 5, 1918, operated as a caveat respecting property, the title to which was then in the bankrupt, we do not see what possible notice it could be as respects property the title to which the bankrupt had transferred more that a year prior thereto.

The rights of the American Trust Company in the second and third mortgages must be determined as of the date of the original assignment to the Trust Company, its assignor. The date of the assignment of the second mortgage to the Trust Company was May 10, 1917. The date of the assignment of the third mortgage to it was on July 26, 1917. The master thought, and the court below concurred in his view, that the Trust Company, at the time it took these mortgages, had such knowledge as put it upon inquiry. His report shows that he thought that the Trust Company was aware of the fact that the moneys which it was advancing to Epstein upon the notes of Rosa Bernstein was being used for the improvement of property which it was chargeable with knowing had been fraudulently transferred to a dummy corporation (Saga Company) to cheat and defraud the creditors of the fraudulent transferror (the Locust Company).

These two mortgages were assigned in writing by the Queens County Trust Company to its successor, the American Trust Company, on September 21, 1920. To defeat the title of the American Trust Company it should appear that the Queens County Trust Company had not acted in good faith and was not a bona fide holder. We do not think this appears. The Trust Company had no knowledge of fraud or of facts sufficient to put it upon inquiry. The question of fraud or no fraud is one necessarily compounded of fact and of law. Jewell v. Knight, 123 U. S. 426, 432, 8 Sup. Ct. 193, 31 L. Ed. 190. There are certain well-established principles which it is necessary to keep in mind when it is sought to invalidate a transfer of property on the ground of fraud.

[8] (1) Whether a conveyance will be held fraudulent by the federal courts as to creditors will be determined by the local law. Olcott v. Bynum, 17 Wall. 44, 21 L. Ed. 570; Lloyd v. Fulton, 91 U. S. 479, 485, 23 L. Ed. 363; Anderson v. Gray (C. C. A.) 284 Fed. 770, 773.

[9] (2) The fact that a grantor is insolvent at the time of the transfer is not of itself a ground for setting it aside. Such a conveyance is not fraudulent, unless there is a fraudulent intent common to both seller and purchaser. Coombs v. Aborn, 29 R. I. 40, 68 Atl. 817, 14 L. R. A. (N. S.) 1248.

[10] (3) It is almost uniformly held that insolvency of the grantor at the time of his conveyance renders it fraudulent as against existing creditors, if the conveyance is not based on a valuable consideration. Kehr v. Smith, 20 Wall. 31, 22 L. Ed. 313; Parish v. Murphree, 13 How. 92, 14 L. Ed. 65.

[11] (4) Where a second purchaser for value and without notice purchases from a first purchaser who is charged with notice, he thereby becomes a bona fide purchaser and is entitled to protection. When

land once comes freed from equities into the hands of a bona fide purchaser, he obtains a complete jus disponendi, subject to an exception not herein involved. Pomeroy's Equity Jurisprudence, vol. 2, § 754; Bumpus v. Platner, 1 Johns. Ch. (N. Y.) 213; Varick v. Briggs, 6 Paige (N. Y.) 323, 329; Coombs v. Aborn, 29 R. I. 40, 42, 68 Atl. 817, 14 L. R. A. (N. S.) 1248.

[12] (5) If a transfer is made for a valuable and adequate consideration, creditors cannot invalidate it, even if the grantor had a fraudulent intent, if the grantee had no actual notice of such intent, or no notice of facts calculated to put him on inquiry and which would lead him to a discovery of the intent. Prewit v. Wilson, 103 U. S. 22, 26 L. Ed. 360; Greenwald v. Wales, 174 N. Y. 140, 66 N. E. 665; Wilcox v. Downing, 88 Conn. 368, 91 Atl. 262; Cohen v. Levy, 221 Mass. 336, 108 N. E. 1074; Bowers v. Bowers, 90 N. J. Eq. 103, 106 Atl. 30; Littieri v. Freda, 241 Pa. 21, 88 Atl. 82; Lyon v. Moore, 259 Ill. 23, 102 N. E. 179; Fassbender v. Donohue, 184 Mich. 52, 150 N. W. 335.

(6) The payment of an adequate consideration by one not a creditor will not validate the conveyance as against creditors, if the grantee had notice at the time of the fraudulent intent of the grantor. Brittain v. Crowther, 54 Fed. 295, 4 C. C. A. 341; Billings v. Russell, 101 N. Y. 226, 4 N. E. 531; Wilcox v. Downing, 88 Conn. 368, 91 Atl. 262.

[13] (7) A bona fide purchaser for value is protected, whether he purchases from a fraudulent grantor or fraudulent grantee, if he acquires title before the creditors have taken any steps to subject the property or set aside the fraudulent conveyance. Bean v. Smith, 2 Fed. Cas. 1143, No. 1174; Sedgwick v. Place, 21 Fed. Cas. 992, No. 12,621.

[14] (8) The general rule is that fraud must be made out by a preponderance of evidence, which should be so clear and strong as to preponderate over the general and reasonable presumption that men are honest and do not ordinarily commit fraud or act in bad faith. 27 C. J. 62. And in Wigmore on Evidence, vol. 4, § 2498, alluding to the rule that in civil cases a preponderance of evidence is sufficient, he states that a stricter standard is applied in cases of fraud. He says:

"But a stricter standard, in some such phrase as 'clear and convincing proof' is commonly applied to measure the necessary persuasion for a charge of fraud," and in a few related classes of cases.

As was said in Jones v. Simpson, 116 U. S. 609, 615, 6 Sup. Ct. 538, 29 L. Ed. 742, the law presumes, in the absence of evidence to the contrary, that the business transactions of every one are carried on in good faith, and any one who alleges that such acts are done in bad faith, or for a dishonest and fraudulent purpose, takes upon himself the business of showing the same. In the above case the court said:

"A further objection is made to the direction given by the court, 'that fraud is never presumed, but must be established by evidence.' Of the correctness of this proposition, or of its application to the case, there should be no question; but counsel seemed to argue that the burden of proof was upon

the plaintiff to show that he did not participate in the fraud now conceded to have been intended by the Howard Bros. Fraud is not so lightly imputed. While certain circumstances will give rise to an inference of fraud, yet the law never presumes it. It devolves on him who alleges fraud to show the same by satisfactory proof; and the burden rested upon the creditors of Howard Bros., who assailed the good faith of Penn in this transaction, to show, by either direct or circumstantial evidence, that the transaction was fraudulent as to Penn."

In Farrar v. Churchill, 135 U. S. 609, 615, 10 Sup. Ct. 771, 773 (34 L. Ed. 246), the court said:

"Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out."

In Lalone v. United States, 164 U. S. 255, 257, 17 Sup. Ct. 74, 75 (41 L. Ed. 425), the court, referring to proceedings to set aside deeds or other written instruments on the ground of fraud practiced by a defendant upon a plaintiff, said that:

"The rule is of long standing, and is of universal application, that the evidence tending to prove the fraud * * * must be clear and satisfactory. It may be circumstantial, but it must be persuasive. A mere preponderance of evidence, which at the same time is vague or ambiguous, is not sufficient to warrant a finding of fraud, and will not sustain a judgment based on such finding."

In United States v. Detroit Lumber Co., 200 U. S. 321, 331, 26 Sup. Ct. 282, 285 (50 L. Ed. 499), the court said:

"We do not understand the law to be as stated, or that one who enters into an ordinary and reasonable contract for the purchase of property from another is bound to presume that the vendor is a wrongdoer, and that therefore he must make a searching inqury as to the validity of his claim to the property. The rule of law in respect to purchases of land or timber is the same as that which obtains in other commercial transactions, and such a rule as is claimed by counsel would shake the foundations of commercial business. No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying full value for the same, acquire the rights of a purchaser in good faith. Jones v. Simpson, 116 U. S. 609, 615. He is not bound to make a searching examination of all the account books of the vendor, nor to hunt for something to cast a suspicion upon the integrity of the title."

In the light of the principles above stated, it is evident that we need not inquire concerning the original transfer by the Locust Building Company, bankrupt, to the Beta Building Company, nor to Rosa Bernstein, nor to the Saga Company. If it be, for the purposes of the argument only conceded, that as against the creditors of the bankrupt all the above transfers were invalid, it will avail the trustee nothing, provided the Trust Company acquired title to the mortgages as a bona fide purchaser for value without notice. If the Trust Company was such a purchaser, the American Trust Company, which has succeeded to its rights, is entitled to enforce them, and its right to the proceeds realized from the sale of the lands covered by the mortgages, and which are now in the hands of the trustee, is superior to the trustee's, and cannot be denied. We shall therefore inquire whether the Trust

Company was a bona fide purchaser for value and without notice when it took the second and third mortgages.

It is admitted that Rosa Bernstein was a dummy for the Saga Company, and that she paid no consideration to that company for the mortgages made and executed to her and which she thereafter assigned to the Trust Company. It is also conceded that Rosa Bernstein gave her notes to the Trust Company as heretofore set forth herein, and that the Trust Company discounted these notes, advancing to her from time to time by checks payable to her order in an amount aggregating $8,333.25, and that each of the checks so payable to her order was indorsed by her to the Saga Company, which received from the Trust Company the amount thereof, and that the proceeds of the said checks were used solely in paying for the improvements erected on the property covered by the mortgages.

The testimony of the president of the Trust Company does not disclose that he or the Trust Company had the slightest knowledge of anything fraudulent, or of any invalidity affecting the title to the mortgages. It does not disclose that he had any information as to the reasons which led to the incorporation of the Locust, the Beta, or the Saga Companies, or that he knew who the stockholders were, or that the operations of the Saga Company were in any wise connected with the operations of the Locust Company, the bankrupt herein, or of the Beta Company. The following is an excerpt from his testimony:

"Q. Don't you know that the property on which the Saga Building Company's operation took place was the proceeds of sale of part of the Locust Building Company's houses? A. No, sir.

"Q. Didn't you know that the Locust Building Company's houses were transferred—that is, two of the houses—I cannot just recall the name of the cousin of Epstein, that the Madison street lots and the Saga Company's lots entered into the transaction? A. No, sir."

Again:

"Q. Was it at the suggestion of the bank that the Saga Building should use Rosa Bernstein or somebody else as a dummy for the purpose of concealing the actual amount of loans made to the Saga Building Company? A. No; I don't think so.

"Q. The bank had no reason to attempt in any way to conceal its dealings or transactions with the Saga Building Company? A. None whatever."

Again:

"Q. The only thing the bank did was to take an assignment of mortgages for notes discounted for her? A. Yes, sir.

"Q. As a matter of fact, those notes were discounted, not for Rosa Bernstein, but for the benefit of Saga Building Company? A. Why, we loaned to Rosa Bernstein. I assume she loaned it to Saga Building Company.

"Q. Don't you know that in this transaction Rosa Bernstein was supposed to be a dummy for Mr. Epstein? A. I only surmised as much."

But, if he had been informed that she was in fact acting as a dummy for the Saga Building Company, we are unable to see that such knowledge as a matter of law would show bad faith or put the Trust Company upon inquiry. That she was a dummy is admitted by both sides. But it is not admitted that the Trust Company knew it. A former president of the Trust Company, who held that office while the Trust

Company was loaning money to the Locust Company and to the Beta Company, as well as at the time the Saga Company was organized, was also examined, and his testimony is in the record. The following are excerpts from his testimony:

"Q. Did you have anything to do with the incorporation of the Beta Building Company? A. No.
"Q. You did not act as counsel? A. No.
"Q. Did you have anything to do with the incorporation or organization of the Saga Building Company? A. No."

His testimony is absolutely barren of any knowledge of fraud, or of anything which put the Trust Company on notice. The only other witnesses whose testimony is in the record were the bookkeeper of the Trust Company, Epstein, the president of the bankrupt and of the Beta and Saga Companies, and of another person who was an official of the American Trust Company, and who, prior to his connection with that company, had been a vice president of the Queens County Trust Company. We have scrutinized the testimony of these witnesses with care, and it seems to us absolutely barren of anything which indicates that the Trust Company, in acquiring the second and third mortgages, which are the ones herein involved, had actual knowledge of any fraud connected therewith, or had notice of facts which made it its duty to inquire concerning them.

We are also satisfied that no fraud is to be imputed to it because of knowledge which the master thought was possessed by its attorneys. We are not able to ascertain from a careful examination of his report what knowledge of fraud the attorneys actually obtained, or upon what testimony the master relied in reaching the conclusion he did upon this phase of the case.

It is said that a transfer of title to the bankrupt was consummated in the office of certain attorneys, and that these same attorneys later searched the title when the Trust Company took the mortgage executed by the Saga Company on these same premises, and that in some way the knowledge which the attorneys acquired when they were acting for other parties is to be imputed to the Trust Company when later they acted for the latter. Neither of these attorneys was examined, or, if examined, the testimony is not preserved in the record. It does not appear what knowledge of fraud, if any, they had acquired, or whether it was present in the mind of either when they later acted in another transaction and for a different client, the Trust Company. We do not think that the title of the Trust Company can be defeated upon any such flimsy evidence as is here relied upon. It does not affirmatively appear that the attorneys in question had anything whatever to do with the transfer of the fee to the bankrupt, or that the contracts for the exchange of the properties, were drawn by them, or that they represented either the grantors or the grantees, although it does appear that the grantors, Buser and Pfundstein, had their own attorneys. It is at best an inference that the attorneys who later acted for the Trust Company acted for the grantees. What fraud there was, if any existed, is not disclosed. The record will be searched in vain for testimony or evidence which shows or tends to show knowl-

edge by the Trust Company, or by its attorneys, of the fraudulent nature of the transfer of the fee.

[15] Notice to an agent is notice to the principal, and according to that rule notice to an attorney is notice to the client. The attorney is conclusively presumed to have informed his client of all material facts which the attorney acquires knowledge of, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority. The rule is unquestioned that notice to an attorney is notice to the client employing him. Rogers v. Palmer, 102 U. S. 263, 26 L. Ed. 164; McKenna v. McArdle, 191 Mass. 96, 77 N. E. 782; Sweeney v. Pratt, 70 Conn. 274, 39 Atl. 182, 66 Am. St. Rep. 101; Griswold v. Smith, 221 Ill. 341, 77 N. E. 551. The knowledge of the attorney is the knowledge of the client. Freeman v. Evans, 159 Fed. 26, 86 C. C. A. 216; Wight v. Muxlow, 29 Fed. Cas. 1174, No. 17,629; McCutcheon v. Dittman, 164 N. Y. 355, 58 N. E. 97; In re Patterson's Estate, 234 Pa. 128, 82 Atl. 1130. It has been held that it is necessary that the knowledge of the attorney be gained in the course of the particular transaction in which he is employed by his client, in order to affect the client. Vietor v. Spalding, 202 Mass. 234, 88 N. E. 846; Stewart v. Sprague, 71 Mich. 50, 38 N. W. 673; Butler v. Morse, 66 N. H. 429, 23 Atl. 90; Otis v. Zeiss, 175 Cal. 192, 165 Pac. 524. And as the doctrine of imputed notice to a client rests upon the ground that the attorney has knowledge of something material to the particular transaction which it is his duty to communicate to his principal, it has been held that notice will not be imputed to the client where it would be a breach of professional confidence to make the communication. See Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167; Melms v. Pabst Brewing Co., 93 Wis. 140, 66 N. W. 244.

Upon the record before us it is impossible for this court to say that the attorneys for the Trust Company, if they had any knowledge of fraud, had acquired it under circumstances which would enable the court to impute that knowledge to their client, the Trust Company. But it does not clearly appear from the record that the Trust Company's attorneys had knowledge of fraud, so that the question is really not raised upon this record as to whether their knowledge is to be imputed to their client, the Trust Company.

[16] It is not at all decisive of the issue now presented that Rosa Bernstein paid no consideration to the Saga Company and acted as a dummy. If the Trust Company took the mortgages by assignments made by her to that company, with the understanding that moneys would be advanced to her, as needed, there was a consideration sufficient to support the Trust Company's title to the mortgages. It certainly will not at this late day be contended that a mortgage to secure future advances cannot be made. A mortgage of that kind was valid at the common law. Gardner v. Graham, 7 Vin. Abr. 22, pl. 3. It is believed that such a mortgage is valid throughout the United States, except where it is forbidden by the local law. The courts of New York, in which the mortgages in question were made, recognize the validity of such mortgages. Ackerman v. Hunsicker, 85 N. Y. 43,

39 Am. Rep. 621; Brinkerhoff v. Marvin, 5 Johns. Ch. 320. And they have been sustained in the Supreme Court of the United States. Jones v. Guaranty & Indemnity Co., 101 U. S. 622, 25 L. Ed. 1030. Such mortgages, in the absence of fraud, are not void as to the creditors of the grantor. Barnum v. Hempstead, 7 Paige (N. Y.) 568; Hendricks v. Robinson, 2 Johns. Ch. (N. Y.) 283, 315, aff'd in Same v. Walden, 17 Johns. 438; Commercial Bank v. Cunningham, 24 Pick. (Mass.) 270, 35 Am. Dec. 322; Drummer v. Smedley, 110 Mich. 466, 68 N. W. 260, 38 L. R. A. 490; Gate City National Bank v. Greene, 105 Kan. 303, 182 Pac. 404. The validity of such a mortgage is not necessarily impaired by the fact that it does not show upon its face the real character of the transaction. Blackmar v. Sharp, 23 R. I. 412, 50 Atl. 852; Huckaba v. Abbott, 87 Ala. 409, 6 South. 48; Title, etc., Co. v. Shoemaker, 257 Pa. 213, 101 Atl. 335. The fact that it recites a present debt when it is intended to cover future loans is not conclusive of fraud. Allen v. Fuget, 42 Kan. 672, 22 Pac. 725; Madigan v. Mead, 31 Minn. 94, 16 N. W. 539; Newkirk v. Newkirk, 56 Mich. 525, 23 N. W. 206.

It is true that, where a purchaser of land has knowledge of facts sufficient to put him on inquiry as to the existence of some right or title in conflict with the one he is about to acquire, he is presumed either to have made the inquiry and ascertained the extent of the prior right, or, if the inquiry has not been made, he must be held guilty of a degree of negligence which is fatal to a claim to be considered a bona fide purchaser for value. Such is the recognized rule in the state of New York, where the land in question lies, the mortgage was given, and the parties reside. Anderson v. Blood, 152 N. Y. 293, 46 N. E. 493, 57 Am. St. Rep. 515; Williamson v. Brown, 15 N. Y. 354. The difficulty in this case lies in the fact that there is nothing in the facts disclosed which makes this rule applicable.

We fail to find in the record evidence which at all satisfies us of any fraud on the part of the Trust Company which renders the mortgages invalid. We have examined the record in vain for evidence which shows knowledge on the part of the Trust Company, or of its attorneys, of the fraudulent nature of the transfer of these mortgages to the Trust Company. Attorneys who are examining a title for the purpose of certifying as to the validity of a mortgage are concerned with the record title, but have no occasion to inquire into the bona fides of the fee title of the mortgagor. It is not proven that the attorneys had any knowledge whatever of fraud as respects the fee transaction. It does not appear that the Trust Company's attorneys had anything to do with the transfer of the fee. The grantors of the fee had their own individual attorneys, who conducted that transaction, and were not the attorneys for the Trust Company.

The decree of the District Court is reversed, and the court is directed to enter a decree ordering the payment to the American Trust Company, by the trustee of the bankrupt, out of the proceeds now in his hands which were realized from the sale of the mortgaged premises, the amounts due and unpaid on the mortgages held by it, with interest on the same, together with costs.