## KATZ *v.* KOWALSKY.

1. Bankruptcy—Assignments—Notice to Debtor—Evidence.

> In action by assignee of an arbitration award against debtor who pleaded discharge in bankruptcy, finding of trial court that notice of the assignment had been given defendant prior to institution of bankruptcy proceedings in which assignor, but not assignee, had been listed as creditor, was not against the great weight of the evidence (11 USCA, § 35).

2. Attorney and Client—Knowledge of Attorney Imputed to Client.

> Ordinarily, where a client is represented by an attorney, knowledge acquired by the attorney while acting within the scope of his authority is, by fiction of law, the knowledge of the client.

3. Bankruptcy—Definition of Creditor Includes Attorney.

> The definition of creditor in the bankruptcy act as anyone who owns a debt, demand, or claim provable in bankruptcy, which may include his duly authorized agent, attorney, or proxy, includes an attorney at law (11 USCA, §§ 1 [11], 35).

4. Same—Notice—Creditors—Attorneys.

> Notice of bankruptcy proceedings to, or actual knowledge thereof by, duly authorized attorney for creditor of bankrupt is the equivalent of notice to the creditor (11 USCA, §§ 1 [11], 35).

5. Same—Notice of Assignment—Attorneys.

> In action of assumpsit on arbitration award for legal services and expenses, by assignee against obligor who, after receiving notice of assignment, filed petition and obtained discharge in bankruptcy in which assignor, but not assignee, was scheduled as a creditor, finding of trial court, sitting without a jury, that assignor and another, brothers of plaintiff assignee, had authority to take care of any matters necessary to protect her interest in the award, and acted as attorneys in fact and at law in respect thereto so as to render assignor's knowledge of debtor's bankruptcy proceedings that of plaintiff assignee was sustained by evidence (11 USCA, §§ 1 [11], 35).

When notice to agent is notice to principal, see 1 Restatement, Agency, § 268.

6. PRINCIPAL AND AGENT—CONSTRUCTIVE NOTICE.

To affect the principal with notice, the agent's knowledge must have been derived from, or be shown to have been present in, the particular transaction, and, further, that it was knowledge of something material to the particular transaction, which it was the agent's duty to communicate to his principal.

7. ATTORNEY AND CLIENT—CONCLUSIVE PRESUMPTION OF KNOWLEDGE.

An attorney is conclusively presumed to have informed his client of all material facts of which the attorney acquires knowledge, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority.

8. BANKRUPTCY—ATTORNEY—AUTHORITY—IMPUTED KNOWLEDGE.

Knowledge of attorney that debtor had filed petition in bankruptcy proceeding is imputed to attorney's client where attorney was nonresident client's brother, had full charge of client's claim against bankrupt, consisting of an arbitration award which attorney had assigned his sister, and attorney had examined list of creditors (11 USCA, §§ 1 [11], 35).

9. SAME—PURPOSE OF NOTICE.

The purpose of the notice or knowledge requirements of the bankruptcy law is to provide a creditor with an equal opportunity with other creditors to participate in the administration of the affairs of the estate and obtain any dividends to which he is entitled (11 USCA, § 35).

10. SAME—NOTICE.

Notice or actual knowledge of bankruptcy proceedings which comes to someone who has clear authority to act for the creditor and which provides ample opportunity to participate in the bankruptcy proceeding satisfies the requirement of the bankruptcy statute (11 USCA, § 35).

11. SAME—ATTORNEY FOR CREDITOR—AUTHORITY—NOTICE—DISCHARGE.

When the attorney for a bankrupt's creditor has complete authority, discretion, and responsibility to act for the creditor without having to consult him, the attorney's failure to transmit the information acquired by him concerning the bankruptcy proceeding or failure to do any affirmative acts on his client's behalf should not affect the debtor's discharge (11 USCA, § 35).

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted October 23, 1940. (Docket No. 114, Calen-

dar No. 41,357.)   Decided January 6, 1941.   Rehearing denied April 11, 1941.

Assumpsit by Lena Katz, assignee of Daniel J. Alpert, against Isadore Kowalsky on an arbitration award.   From judgment for plaintiff, defendant appeals.   Reversed.

*Daniel J. Alpert* (*Thomas W. Payne* and *Paul J. Wieselberg,* of counsel), for plaintiff.

*Joslyn, Joslyn & Joslyn,* for defendant.

BUTZEL, J. Plaintiff, assignee of Daniel J. Alpert, her brother, sued in assumpsit on an arbitration award dated January 31, 1931.   The award grew out of Alpert's disputed claim for legal services and expenses in representing defendant for several years in tax title litigation.   Alpert and defendant agreed to submit their differences to arbitrators, and they awarded Mr. Alpert $10,000; he gave his written consent to accept tax titles and tax leases in lieu of the cash award, but defendant never attempted to fulfill the obligation.   Defendant pleaded that he filed his petition in bankruptcy on February 11, 1931, that he subsequently obtained a discharge, and that the obligation was properly scheduled in Alpert's name because defendant had no knowledge of the assignment to plaintiff.   Alpert admitted having knowledge of the bankruptcy proceedings shortly after they were instituted.   The trial court expressed his difficulty in weighing the highly conflicting testimony consisting mainly of witnesses who were interested, but found for plaintiff on all disputed questions of fact, finding specifically that on January 31, 1931, Alpert personally served a copy of the assignment on defendant, and

from this he concluded that the debt was not discharged by defendant's bankruptcy because of the failure to schedule plaintiff as a creditor. There is nothing in the record to indicate that plaintiff personally had "notice or actual knowledge" (11 USCA, § 35) of the bankruptcy proceedings.

Defendant contends that the finding that he had notice of the assignment is against the great weight of the evidence; he also contends that Alpert was plaintiff's attorney with full charge of protecting plaintiff's interests, and that his actual knowledge of the bankruptcy proceedings should be imputed to plaintiff to make the discharge operative on plaintiff's debt. Plaintiff contends that there is no proof establishing an agency between plaintiff and Alpert during the period that the claim could have been proved and allowed, and that even if the great weight of the evidence revealed such a relationship, Alpert's knowledge of the bankruptcy cannot be imputed to plaintiff.

Plaintiff is a resident of Connecticut. She testified that just before the assignment was executed, Alpert was having financial difficulties and needed $4,000 immediately. Benjamin Alpert, another brother, telephoned plaintiff in Connecticut and urged her to loan Daniel the $4,000; she agreed to do so on the understanding that Daniel would assign to her as security his award against defendant. Accordingly the funds were promptly forwarded to Benjamin, who unquestionably disbursed them for Daniel's benefit. Benjamin insisted that the award be assigned immediately, and he demanded that his brother Daniel promptly serve a copy of the assignment on defendant. The trial court found that such copy was served on defendant before he filed his petition in bankruptcy; it is undisputed that Daniel was scheduled as a creditor, but plaintiff was not.

Daniel admitted that he knew of the bankruptcy proceedings in time to participate therein in behalf of his sister, but did not inform her of the fact. He testified:

"When I learned of his petition in bankruptcy, I went down and examined the schedule to see what the listings of his creditors was, to see whether my sister was listed or not, and I found that he did not list her. * * * I examined the schedules probably the latter part of February. I went down there several times and checked into it."

He admitted being "vitally interested" in whether his sister was scheduled, and stated:

"Well, I know the law on bankruptcy sufficiently to know that if I would inform her of bankruptcy proceedings, she would be bound by those proceedings, she would be called upon to file her claim. Yes, I know that is the law."

When asked why he did not tell his sister about the bankruptcy proceedings, he explained:

"Because as a lawyer I knew if she obtained knowledge of the existing bankruptcy proceedings, that she would be bound to participate in them, too, and I felt if she had no knowledge of it, her claim against Kowalsky under that award would not be extinguished by this discharge in bankruptcy."

On the question of the weight of the evidence, we share the trial court's doubts and bewilderment in making findings from the testimony. There are many unexplained, and perhaps inexplainable, discrepancies in the proofs produced for plaintiff. The stenographer who testified that she accompanied Daniel when he served the assignment first stated that she was Daniel's regular stenographer; later it was shown that at this time she had a full-time

job in a lawyer's office in another building. Then she explained that, although she had this full-time job, she spent a part of her lunch hour almost every day at Daniel's office in order to get more practice in dictation and legal stenography. Daniel's testimony is likewise highly inconsistent. He insisted that after January 31, 1931, he acted for his sister in connection with the award because after the assignment it belonged to her. Yet he filed in his own behalf an affidavit dated December 10, 1931, in a proceeding to establish a lien on the tax titles which were the subject of the litigation in which he had represented defendant. In this affidavit, Daniel swore that

"Esidore [*sic*] Kowalsky was indebted and *is now* indebted to this deponent in a large sum of money and that an arbitration was had * * * and that a final award was made."

Furthermore, in January, 1932, slightly less than a year after the assignment, Daniel wrote one of the arbitrators asking him to arrange to make delivery to him of the tax titles under the award and agreement. When asked to explain for whom he wrote it, he insisted that the letter spoke for itself; then he explained that his brother asked him to do it; when asked again for whom he was acting, he repeated that "the letter speaks for itself."

In concluding that the copy of the assignment was served on defendant in January, 1931, the trial court recognized some of these discrepancies but commented that he was "not dealing with the average or garden variety of litigants in this matter but had to deal with an attorney as the principal witness for the plaintiff and his former client." Although we have the same doubts as to the facts, the trier had the witnesses before him and, under the circum-

stances presented by the record, we cannot hold that the finding of the trial court is against the great weight of the evidence.

We must determine whether Daniel's knowledge of defendant's bankruptcy proceeding may be deemed that of plaintiff. 11 USCA, § 35, provides:

"A discharge in bankruptcy shall release a bankrupt from all his provable debts, except such as * * * have not been duly scheduled in time for proof and allowance, with the name of the creditor, if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy."

See, also, *Wineman* v. *Fisher,* 135 Mich. 604; *Van Gilder* v. *Barnes,* 288 Mich. 492; *Levine* v. *Katz,* 293 Mich. 493. Were this strictly a common-law question, we would have no hesitation in ruling that the knowledge of Daniel, if obtained within the limits of authority delegated by his sister, must be deemed the knowledge of plaintiff. Ordinarily, where a client is represented by an attorney, knowledge acquired by the attorney while acting within the scope of his authority is, by fiction of law, the knowledge of the client. *Littauer* v. *Houck,* 92 Mich. 162 (31 Am. St. Rep. 572); *Security Trust Co.* v. *Tuller,* 243 Mich. 570; *Rogers* v. *Palmer,* 102 U. S. 263 (26 L. Ed. 164); *In re Locust Building Co.* (C. C. A.), 299 Fed. 756, certiorari denied 265 U. S. 590 (44 Sup. Ct. 635, 68 L. Ed. 1195). However, we are dealing here with the words "notice or actual knowledge" as used in a specific statute. We need not inquire into whether the words of the statute have all of the connotations the terms usually bear in common-law jurisprudence, for reference to the definitions provided in the statute itself gives a complete answer to the problem. 11 USCA, § 1(11), explains the construction to be given the

word "creditors," "unless the same be inconsistent with the context":

" 'Creditor' shall include anyone who owns a debt, demand, or claim provable in bankruptcy, and may include his *duly authorized* agent, *attorney,* or proxy."

This definition includes an attorney at law. *In re Henschel,* 109 Fed. 861 (reversed on other grounds in 51 C. C. A. 277 [113 Fed. 443]). Thus, we think from a reading of the statute itself, notice or actual knowledge of a duly authorized attorney is the equivalent of notice to the creditor. See Gilbert's Collier on Bankruptcy, § 564, p. 377; 7 Remington on Bankruptcy (5th Ed.), § 3581, p. 845; *Keefauver* v. *Hevenor,* 163 App. Div. 531 (148 N. Y. Supp. 434); *Vaughn* v. *Irwin,* 49 Misc. 611 (96 N. Y. Supp. 742); *Vital* v. *Jandorf,* 126 Misc. 124 (212 N. Y. Supp. 548); *American Southern Trust Co.* v. *Vester,* 183 Ark. 9 (34 S. W. [2d] 747). Compare: *Lynch* v. *McKee* (Tex. Civ. App.), 214 S. W. 484; *Strickland* v. *Capital City Mills,* 74 S. C. 16 (54 S. E. 220, 7 L. R. A. [N. S.] 426); *Interstate Credit League* v. *Widdison,* 50 Idaho, 493 (297 Pac. 1106).

The next problem is whether Daniel was plaintiff's attorney with full charge of protecting plaintiff's interests. The trial court's finding on the question of Daniel's authority as an attorney is somewhat incomplete:

"I find also that the plaintiff did not know of the existing bankruptcy proceedings, or in fact had much to do with the matter, relying as she naturally would on the fact that her brother or brothers would look after her interests in this transaction."

We think the finding, when viewed in the light of the testimony, must be deemed a finding that both Daniel and Benjamin were authorized to take care of any matters necessary to protect her interest in

the award. At first plaintiff testified that she "left it up to Ben to look after" her interests in Detroit; she said that he had "full authority" to act for her in any way as long as he got her money, and that she did not specifically authorize Daniel to institute this suit for her and did not even know that he was the attorney of record. Then she explained:

"*A.* I left it to them, I told him I wasn't interested in the technicalities or anything concerned with it. * * *

"*A.* I left it with them to protect me. * * *

"*Q.* You were then willing to leave this all up to Dan, as well as to Ben, wouldn't you?

"*A.* Yes, I certainly would, I would leave it to either one, I trusted them both. * * * During this telephone conversation in January, 1931, Daniel Alpert told me that he needed $4,000 badly. I don't remember whether he said there was an award or that he was to receive an award. All I remember was that he needed the money badly and he asked me to loan it to him, and that I would positively get my money back. I looked to Dan, as well as to Ben to look after my interests.

"*Q.* And you told him that, didn't you?

"*A.* I don't remember what I told them.

"*Q.* You don't remember that? All right.

"*A.* I didn't think it was necessary to tell them—I had faith in my brothers.

"*Q.* You assumed that they would both look after your interests?

"*A.* Yes, I did."

Benjamin testified that when he and Daniel talked to their sister by telephone at the time the loan was arranged, he assured her that he would "take care of her money." He also testified that according to his recollection, both of them made the same assurance to their sister. For the first six months or year thereafter, Benjamin "didn't do much about

the claim," but he thought that Daniel would collect it. He testified:

"During that time when I did nothing, I was expecting Dan to do something about it. * * * He owed an obligation to his sister, to look after her interest."

Daniel testified:

"*Q.* You are the attorney, according to the record, that instituted this suit for Lena Katz?

"*A.* That's right.

"*Q.* When was you retained?

"*A.* My sister retained me.

"*Q.* Who did?

"*A.* My brother, Ben, told me to go ahead and get started to collect this money, that he had made efforts, that he could not get the money. * * *

"*Q.* You spoke of the relationship between your sister and Ben by saying that you didn't know what the relationship was, whether it was attorney and client or brother and sister?

"*A.* That's right.

"*Q.* Is that true?

"*A.* That is true."

From a careful examination of the record, we think the trial court's finding is to be interpreted as concluding that both Benjamin and Daniel had charge of doing all things necessary to protect the interests of their sister. That the scope of their authority was very broad is revealed by the very words of the parties at the time the loan was arranged, and by the subsequent fact that Daniel was free to go ahead and institute suit at any time without consulting his sister if he deemed it advisable to protect her interests. It is to be noted that when the matter came up for trial, she co-operated by coming to Detroit from her home in Connecticut. The circumstance of blood relationship plus the fact that those to whom the matters were entrusted were

attorneys as well as brothers suggests a broader scope of authority and discretion than perhaps a layman might have, although a cautious witness claimed he did not know whether the relationship was that of brother and sister or attorney and client. The facts which transpired speak more emphatically than the mere inability of the witness to characterize his connection with the events. There is no room for doubt that both Benjamin and Daniel acted as attorneys in fact and at law.

Finally, we must determine whether the knowledge which Daniel acquired came to him while acting within the scope of the duties delegated by his sister. The principles of the law of agency as applied to the attorney-client relation were stated by Lord Chancellor Westbury in *Wyllie* v. *Pollen*, 3 DeGrex, J. & S. 596 (46 Eng. Rep. 767, 32 L. J. Ch. 782, 9 L. T. 71, 2 N. R. 500, 11 W. R. 1081):

"To affect the principal with notice, the agent's knowledge must have been derived in the particular transaction in hand, or be shewn to have been in that transaction present to his mind; and, further, it must have been knowledge of something material to the particular transaction, and something which it was the agent's duty to communicate to his principal; the whole doctrine of constructive notice resting on the ground of the existence of such a duty on the part of the agent."

In *Re Locust Building Co., supra*, 769, it was said:

"The attorney is conclusively presumed to have informed his client of all material facts which the attorney acquires knowledge of, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority. The rule is unquestioned that notice to an attorney is notice to the client employing him."

Daniel admitted that when he learned that defendant had filed his petition in bankruptcy, he examined the schedule to see whether his sister was listed. There can be no question but that his purpose here was to protect his sister, for if he found that she was listed as a creditor, the implication is unmistakable that he would have taken the necessary steps for her participation. However, not finding her name scheduled, he seeks to turn about face and deny that the information was acquired while acting within his broad duties toward his sister. We do not think this argument is tenable under the circumstances before us. Daniel had full charge of the claim; his authority is coexistent with the trust. The purpose of the notice or knowledge requirements of the bankruptcy laws are to provide a creditor "an equal opportunity with other creditors" to participate in the administration of the affairs of the estate and obtain any dividends to which he is entitled. *Birkett* v. *Columbia Bank*, 195 U. S. 345 (25 Sup. Ct. 38, 49 L. Ed. 231). Notice or actual knowledge which comes to someone who has clear authority to act for the creditor and which provides ample opportunity to participate in the bankruptcy proceeding satisfies the requirement of the law. When the attorney has such complete authority, discretion, and responsibility without having to consult his client, his failure to transmit the information concerning the debtor's bankruptcy or failure to do any affirmative acts on his client's behalf should not affect the discharge.

Our ruling on this question obviates discussion of the other questions raised. The judgment is reversed, and a judgment may be entered for defendant, with costs.

SHARPE, C. J., and BUSHNELL, BOYLES, CHANDLER, NORTH, MCALLISTER and WIEST, JJ., concurred.